238 N.J. Super. 179 (1989)
569 A.2d 312
ALFRED A. SLOCUM PUBLIC ADVOCATE OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
THE BOROUGH OF BELMAR DEFENDANT.
Superior Court of New Jersey, Law Division Monmouth County.
Decided August 29, 1989.
*182 Richard E. Shapiro and John P. Thurber, for plaintiff (Alfred A. Slocum, Public Advocate of New Jersey, attorney).
Timothy M. Crammer, for defendant (Crammer & Covelli, attorneys).
MILBERG, A.J.S.C.
In this action, in lieu of prerogative writs, Public Advocate of the State of New Jersey, Alfred A. Slocum, challenges the reasonableness of the beach admission fees charged by the defendant, Borough of Belmar, for the use of its ocean beach area, and seeks the following declaratory and injunctive relief from this court:
1) that defendant establish a beach admission fee setting process that conforms to the requirements of an appointed public trustee;
2) that the court direct Belmar to institute a test year at a "$2" daily beach admission fee for the remainder of the 1989 summer season and for the 1990 season; and
3) that any beach admission fee revenue collected by Belmar in excess of that lawfully recoverable under N.J.S.A. 40:61-22.20 be refunded to the public in the form of future reductions of beach fees.
The complaint in this case was filed on May 22, 1987. The parties engaged in extensive discovery.[1] Prior to trial, Belmar's third-party complaint seeking relief against 22 other New Jersey shorefront communities was dismissed, and Belmar's motion for partial summary judgment barring plaintiff's claim *183 for repayment of beach admission fee overcharges under the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 et seg., was denied. Public Advocate v. Belmar Bor., 233 N.J. Super. 437, 559 A.2d 17 (Law Div. 1989). Six expert witnesses testified on behalf of the litigants in an eight-day trial.
In resolving this controversy, the court is required to address the following issues of law:
1) whether Belmar's beach admission fee setting policies conform to the municipality's duties and responsibilities under the public trust doctrine as a trustee of a public beach area;
2) whether Belmar's daily beach admission fees operate as a bar to public access, thus discriminating against nonresidents in violation of the public trust doctrine and Article 1, paragraph 1 of the New Jersey Constitution; and
3) whether the daily beach admission fees charged by the Borough of Belmar violate N.J.S.A. 40:61-22.20.
Specifically, this court must determine whether the beach fees imposed by Belmar produce revenues in excess of that necessary to offset legitimate beachfront related expenditures, and therefore, exceed the fees permissible under N.J.S.A. 40:61-22.20; and whether the beach admission fees imposed by Belmar are unreasonably high and unaffordable to many beachgoers.

I.

Facts
Belmar is an oceanfront resort community located in Monmouth County, New Jersey, maintaining a year-round population of approximately 6,700 residents which nearly doubles during the summer months. In addition to the summer increase in resident population, Borough Clerk Charles Ormsbee, testified that as many as 25,000-35,000 people visit Belmar on peak summer days. The reason for the influx of seasonal residents and day visitors in the summer is Belmar's ocean beach.
Belmar's land area is approximately one square mile, with a beachfront area that extends 1.4 miles along the eastern boundary *184 of the municipality. Belmar's ocean beaches run the entire length of the municipal border east of Ocean Avenue. Ocean Avenue is parallel to the boardwalk and connects Belmar with Avon to the north, Spring Lake to the south, and Shark River to the west.
The average width of Belmar's beaches, depending upon the tide and the location, is 270 feet. This provides approximately 46.9 acres of beach. According to Borough Engineer, William Birdsall, the recreational capacity of the beach, using the "comfort zone" standard of 870 people an acre a day, is just over 40,000.
An elevated wood boardwalk, which is 30 feet wide, runs the entire length of the beach at its western edge. Access to Belmar's boardwalk is provided at 21 points by both ramps and stairways to Ocean Avenue and to the beach itself. Drinking fountains and freshwater showers are located on the beach at the base of each access ramp. Public facilities on the boardwalk include five restrooms, lockers for bathers, a pavilion, a first-aid station, numerous benches and trash containers. All of the facilities and equipment on the beach and boardwalk are owned and maintained by Belmar.
To the west of Ocean Avenue, there are many commercial establishments, including numerous restaurants, bars and retail shops, as well as Belmar's "Playland." Additionally, on Shark River there is a municipally owned marina and a public parking lot servicing the borough and its visitors. These attractions generate a substantial amount of summer season traffic "irrespective of the beach."
Several major roadways provide access to the municipality from almost every part of New Jersey, as well as the Philadelphia and New York metropolitan areas. State Highway 35, which runs in a north-south direction through Monmouth and Ocean Counties, is Belmar's westernmost roadway. The eastern end of Interstate 195 terminates in Belmar. An entrance-exit interchange for the Garden State Parkway is located at the *185 parkway's intersection with Interstate 195, approximately three miles west of Belmar. New Jersey Transit provides rail and bus access from the Newark and New York areas.
Belmar began charging a beach admission fee in 1933. Today, the purchase of a beach badge is required for admission onto Belmar's beaches from 9:00 a.m. until 5:00 p.m. throughout the summer season. Belmar's summer season opens on the Saturday of the Memorial Day weekend, and continues until Labor Day. Badges are not required on weekdays until approximately June 15th.
Under Belmar's beach fee ordinances, children under the age of 14 are not required to have beach badges. Senior citizens, defined by the borough as anyone over 65 years of age, are offered a discount on the price of season badges. No badge is required and no fee is charged for the summer season use of the beach after 5:00 p.m. and before 9:00 a.m., as well as for any time during the non-season. Furthermore, no badge is ever required for the use of the boardwalk. Currently, for the 1989 season, Belmar charges "$3" for daily weekdays, "$6" for daily weekend fees, and "$40" for a seasonal pass. This year, Belmar has formed a beach utility to oversee the operation of the beach and its related accounts.

II.

The Public Trust Doctrine.
The public trust doctrine has always been recognized in New Jersey and is deeply engrained in our common law. Van Ness v. Bor. of Deal, 78 N.J. 174, 179, 393 A.2d 571 (1978); Arnold v. Mundy, 6 N.J.L. 1 (Sup.Ct. 1821). The doctrine is premised on the common rights of all citizens to use and enjoy tidal land seaward of the mean high water mark. Lusardi v. Curtis Point Prop. Owners Ass'n, 86 N.J. 217, 228, 430 A.2d 881 (1981). It acknowledges that ownership, dominion, and sovereignty over land flowed by tidal waters, that extends to the mean high water mark, is vested in the State in trust for *186 the people. Matthews v. Bay Head Imp. Ass'n, 95 N.J. 306, 312, 471 A.2d 355 (1984). The Supreme Court in Bor. of Neptune City v. Bor. of Avon-by-the-Sea, 61 N.J. 296, 294 A.2d 47 (1972), extended the public trust doctrine to include the upland sand area as well.
[W]here the upland sand area is owned by a municipality  a political subdivision and creature of the state  and dedicated to public beach purposes, a modern court must take the view that the pubic trust doctrine dictates that the beach and the ocean waters must be open to all on equal terms and without preference and that any contrary state or municipal action is impermissible. [Id. at 308-309, 294 A.2d 47; emphasis supplied]
The Court further stated:
The public rights in tidal lands are not limited to the ancient prerogatives of navigation and fishing, but extend as well to recreational uses, including bathing, swimming, and other shore activities. [Id. at 309, 294 A.2d 47]
Furthermore, the public trust doctrine should not be considered fixed or static, but should be molded and extended to meet the changing conditions and needs of the public it was created to benefit. Ibid. Accordingly, in order to exercise rights guaranteed by the public trust doctrine, the public must have access to municipally owned dry sand areas as well as the foreshore. Id. at 321-322, 294 A.2d 47.
The Public Advocate contends that Belmar has failed to adopt beach fee setting policies that conform to the municipality's duties and responsibilities under the public trust doctrine as a trustee of a public beachfront. Belmar claims that the fact that it is required to administer its dry sand beach in trust for the use and enjoyment of all the citizens of the State does not convert the municipality into a trustee.
A trustee is defined as the person appointed, or required by law, to execute a trust; one in whom an estate, interest, or power is vested, under an express or implied agreement to administer or exercise it for the benefit of another. Black's Law Dictionary (5 ed. 1979) at 1357. Generally, the duties of a trustee depend upon the terms of the trust, and where there is no provision, express or implied, within the terms of the trust, the trustee's duties are determined by principles and rules *187 evolved by courts of equity. Branch v. White, 99 N.J. Super. 295, 239 A.2d 665 (App.Div. 1968), certif. den. 51 N.J. 464, 242 A.2d 13 (1968).
N.J.S.A. 40:61-22.20 impliedly appoints Belmar as trustee over its beaches.
Lands bordering on ocean, tidal water bays or rivers; government and policing; fees.
The governing body of any municipality bordering on the Atlantic ocean, tidal water bays or rivers which owns or shall acquire, by any deed of dedication or otherwise, lands bordering on the ocean, tidal water bays or rivers, or easement rights therein, for a place of resort for public health and recreation and for other public purposes shall have the exclusive control, government and care thereof and of any boardwalk, bathing and recreational facilities, safeguards and equipment, now or hereafter constructed or provided thereon, and may by ordinance, make and enforce rules and regulations for the government and policing of such lands, boardwalk, bathing facilities, safeguards and equipment; provided, that such power of control, government, care and policing shall not be construed in any manner to exclude or interfere with the operation of any State law or authority with respect to such lands, property and facilities. Any such municipality may, in order to provide funds to improve, maintain and police the same and to protect the same from erosion, encroachment and damage by sea or otherwise, and to provide facilities and safeguards for public bathing and recreation, including the employment of lifeguards, by ordinance, make and enforce rules and regulations for the government, use, maintenance and policing thereof and provide for the charging and collecting of reasonable fees for the registration of persons using said lands and bathing facilities, for access to the beach and bathing and recreational grounds so provided and for the use of the bathing and recreational facilities, but no such fees shall be charged or collected from children under the age of 12 years. L. 1955, c. 49, p. 165, sec. 1, eff. June 7, 1955. [Emphasis supplied.]
The statute grants the municipality the power to make and enforce rules and regulations for the governing and care of the beach and its facilities. New Jersey courts have traditionally recognized that the sovereign's ownership is "in trust for the benefit of the public." Cobb v. Davenport, 32 N.J.L. 369, 378 (Sup.Ct. 1867), reh'g 33 N.J.L. 233 (Sup.Ct. 1868); Arnold, supra, 6 N.J.L. at 71. The New Jersey Supreme Court recognizes the municipality's trustee obligation over public beaches by characterizing the lands subject to the public trust doctrine as "trust lands." Avon, supra, 61 N.J. at 306, 308, 294 A.2d 47. Accordingly, Belmar is a trustee over its beach area and the *188 public is the beneficiary of the trust lands. As such, I find that Belmar has breached its duties and obligations as a trustee.
A public trustee is endowed with the same duties and obligations as an ordinary trustee. That is, the trustee owes to the beneficiary a duty of loyalty, Branch, supra, 99 N.J. Super. at 295, 239 A.2d 665, a duty of care, Commercial Trust Co. of N.J. v. Barnard, 27 N.J. 332, 142 A.2d 865 (1958), and a duty of full disclosure, Branch, supra, 99 N.J. Super. at 306-307, 239 A.2d 665. Additionally, a trustee has the duty to keep clear and adequate records and accounts. In re Herr, 22 N.J. 276, 125 A.2d 706 (1956). When the trustee fails to keep proper accounts, all doubts are resolved against him. Societa Operaia, etc. Villalba v. Di Maria, 40 N.J. Super. 344, 349, 122 A.2d 897 (Ch.Div. 1956).
I find that the borough, as trustee, has shown little care and foresight in regard to its beneficiaries  the beachgoing public. The evidence in this case clearly indicates that Belmar breached its duty of loyalty to the public by increasing beach admission fees, rather than real estate taxes, in order to raise the borough's general revenues. The borough failed to keep clear and adequate records of beachfront expenditures. Belmar's expenditures were not traceable to any records maintained by the borough but rather were based upon guesses and estimates by the borough clerk and staff. Belmar commingled its general revenues with its beachfront related revenues. It operated the beach area as though it were a commercial business enterprise for the sole benefit of its taxpayers. This conduct resulted in surplus beach fee revenues being used to subsidize other municipal expenditures for the exclusive benefit of the residents of Belmar, rather than being set aside to meet future beach-related costs. These actions place the interest of Belmar's residents before those of the beachgoers, in violation of the borough's duty under the public trust doctrine. Additionally, I find that the appointment of a trustee, as requested by the Public Advocate, is unnecessary. Belmar, as trustee *189 over its beach area, shall follow the guidelines set forth by this court in this opinion to ensure that the interests of the beachgoing public are protected.

III.

Discrimination Against Nonresidents.
The public trust doctrine mandates that the beach be open to all on equal terms without preference. Van Ness, supra, 78 N.J. at 179, 393 A.2d 571. The Court in Avon stated that the enactment of a statute authorizing a municipality to charge beach user fees did not manifest legislative intent to authorize discrimination in fees between residents and nonresidents. Avon, supra, 61 N.J. at 301, 294 A.2d 47. The Court went on to hold that municipalities may validly charge reasonable fees for use of their beaches but may not discriminate in any respect between residents and nonresidents. Id. at 310, 294 A.2d 47.
This court finds that Belmar's price structure for beach fees discriminates against nonresidents by imposing a disproportionately and inequitably high fee on daily and weekend beach badge purchasers.
Active discrimination is a mental process in which one willingly chooses one alternative over another. Parker v. Dornbierer, 140 N.J. Super. 185, 188-189, 356 A.2d 1 (App.Div. 1976). This intent to discriminate is found by examining what was said and done in the circumstances of the entire transaction. Id. at 188-189, 356 A.2d 1.
Belmar experienced extreme overcrowding on the beach and boardwalk during the 1985 season. There was tension and antagonism among community residents towards outsiders. This outcry led the commissioners to raise the 1986 fee, effectively precluding many nonresidents from using the beach. The October 7, 1985 commissioners' agenda meeting, and the *190 testimony presented at trial clearly show that Belmar intended to discriminate against nonresident beachgoers.[2]
Evidence of Belmar's intent to discriminate is apparent by the double fee charged on weekends as compared to weekdays. Any additional costs that Belmar may incur in operating and maintaining the beach on weekends should be offset by the additional revenues that will be collected by the increased number of beachgoers. Additionally, the disproportionate price gap between seasonal and daily admission fees is further evidence of Belmar's intent to discriminate against nonresidents. The majority of weekend badge purchasers were nonresidents and the difference between the cost per day for a seasonal badge and the cost per day for a weekend daily badge was quite extreme. By paying a vastly greater per day price for their badges, the daytrippers have been subsidizing season badge holders. Additional proof of this discrimination is the fact that Belmar, without justification, has raised the price of daily and weekend badges faster than the price of seasonal badges.

IV.

Reasonable Fees Under N.J.S.A. 40:61-22.20.
N.J.S.A. 40:61-22.20 sets forth the statutory authority to charge beach user fees. The Public Advocate claims that the statute only includes costs associated with the operation and maintenance of the beachfront. Belmar contends that beach related expenses include all those expenditures which the municipality would not incur if it was not a beachfront community.
The avenue this court must take in resolving this issue is one of statutory interpretation. The primary aim in interpreting *191 a statute is to determine the fundamental purpose for which the legislation was enacted, and where a literal reading will lead to a result not in accordance with the essential goals of the act, the spirit of the law will control the letter. New Jersey Builders, Owners & Managers Ass'n v. Blair, 60 N.J. 330, 288 A.2d 855 (1972). Where there is no explicit indication of a special meaning, statutory words are given their ordinary and well understood meaning. Matter of Schedule of Rules for Barnert Memorial Hospital, 92 N.J. 31, 455 A.2d 469 (1983); Levin v. Parsippany-Troy Hills, 82 N.J. 174, 411 A.2d 704 (1980). In this case, the phrase "reasonable fees" requires statutory interpretation.
It is clear that N.J.S.A. 40:61-22.20 was enacted for the purpose of authorizing shore municipalities to charge beach user fees in order to reimburse the municipality for its costs associated with the beachfront. The determination of what costs may be reasonably allocated to the beach badge purchaser is the thrust of this case.
The Court in Avon acknowledged the burdens placed upon oceanfront municipalities and discussed the rationale behind the statute. The Court found that in determining a reasonable fee, municipalities "may consider all additional costs legitimately attributable to the operation and maintenance of the beachfront, including direct beach operational expenses, additional personnel and services required in the entire community, debt service of outstanding obligations incurred for beach improvements and preservation, and a reasonable annual reserve designed to meet expected future capital expenses." Avon, supra, 61 N.J. at 311, 294 A.2d 47; emphasis supplied.
It is clear that the statute directs its "reasonable fee" standard to the municipality, however, this fee must be reasonable in relation to the municipality's expenses incurred as a result of the beachfront. That is not to say that Belmar can "fantasize" that it is an inland community and allocate any additional costs *192 above and beyond its imaginary expenses as an inland community.[3]
Belmar, as a beachfront municipality, benefits overall from the shore attraction. This is an added benefit, or in some cases, a burden to the municipality that comes with the territory. See Van Ness, supra, 78 N.J. at 174, 393 A.2d 571; Avon, supra, 61 N.J. at 299, 294 A.2d 47. The collection of reasonable fees directly related to the beachfront was designed to offset these community burdens. The Legislature understood that there would be an enormous impact on the community spirit, as well as the community finances. Thus, the statute is designed to subsidize the costs related directly to the beachfront.
It is this court's obligation to determine what constitutes reasonable expenditures in light of N.J.S.A. 40:61-22.20 for the benefit of both the beachgoer and the Belmar community.
Michelle Bowman, an expert in the field of accounting, with a special emphasis on trust accounting, financial reporting and cost allocation, testified on behalf of the Public Advocate. This witness, who supported her testimony with a written report, examined 30 separate items of expenditure relating to beachfront activities and recommended how each of these items should be allocated to the operation of Belmar's beachfront facility. In support of Belmar's position, Robert Hulsart, a certified public accountant, registered municipal accountant, and expert auditor in municipal finance, testified that the allocations of beach related expenses devised by the Borough Clerk, Charles Ormsbee, were reasonable under N.J.S.A. 40:61-22.20. This court finds Bowman's allocations to be more credible and reasonable than Belmar's, and accordingly adopts a majority of the Bowman findings relating to legitimate beachfront expenditures. *193 Additionally, this court finds that Belmar's allocations are mere speculations, unsupported by any explanation or records. Belmar's allocations are arbitrary, unreasonable and discriminatory against the beach badge purchaser; the revenues derived are more than are needed to defray the operational costs permitted under the statute.
Accordingly, this court determines that the beach admission fees charged by Belmar under N.J.S.A. 40:61-22.20 are unreasonable.

V.

Reimbursement
The Public Advocate seeks a reimbursement to the beachgoing public of all beach admission fee revenues collected in excess of that lawfully recoverable under N.J.S.A. 40:61-22.20. The Public Advocate's expert calculated the amount to be "$3,144,143" for the 1984-1986 time period.
It has been held that money voluntarily paid with full knowledge of the facts, even if for an unjust claim, or if paid under protest cannot be recovered. McGregor v. Erie Railroad Co., 35 N.J.L. 89, 112 (Sup.Ct. 1871). Recovery is permitted in a limited number of cases.
But it lies for money paid by mistake, or upon a consideration which happens to fail, or for money got through imposition, express or implied, or extortion, or opposition, or an undue advantage taken of the plaintiff's situation. Contrary to laws made for the protection of persons under those circumstances.
McGregor, 35 N.J.L. at 112. Cf. Brinkman v. Urban Realty Co. Inc., 10 N.J. 113, 119, 120, 89 A.2d 394 (1952).
In Los Angeles Gas & Electric Corp. v. R.R. Comm'n of California, 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180 (1933), the Supreme Court held:
Deficits in the past do not afford a legal basis for invalidating rates, otherwise compensatory, any more than past profits can be used to sustain confiscatory rates for the future. [289 U.S. at 313, 53 S.Ct. at 647, 77 L.Ed. at 1197]
See also In re Intrastate Industrial Sand Rates, 66 N.J. 12, 23, 327 A.2d 427 (1974).
*194 A reimbursement of the overcharged beach fees is inappropriate in the present case. No one was forced to use Belmar's beaches, and the fees were not involuntarily paid. The public had full knowledge of the beach admission fees; there was no element of fraud or duress. The beachgoers also had alternatives available to them. In close proximity to Belmar, there are many beach municipalities that charge lower beach admission fees. These beachgoers had the choice of visiting any one of these beaches rather than Belmar. They chose not to do so. See, e.g., Brinkman, supra, 10 N.J. at 120, 89 A.2d 394.
Additionally, too many unidentified people have visited Belmar's beaches during the past five years for there to be a just and fair return on the amount overcharged. There is no evidence or assurance that the same beachgoers would return to Belmar in the future and take advantage of the reduced rates. While this remedy may benefit the public at large, it would not benefit the actual aggrieved parties.
Furthermore, Belmar's records are inadequate and incomplete, and, as such, it is not possible to define the exact amount of profits generated by the borough in relation to the borough's costs. Belmar, most likely, relied upon these revenues to create its budgets for the future years; and it would be unfair to the taxpayers of Belmar to have to recoup the losses for the past actions of the borough commissioners.
Accordingly, this court denies plaintiff's requested relief for reimbursement of past admission fee charges.

VI.

Remedies.
N.J.S.A. 40:61-22.20 authorizes Belmar to charge a reasonable beach admission fee in order to raise funds to defray the costs associated with the operation and maintenance of its beachfront.
*195 This court has found that the beach admission fees currently charged by the Borough of Belmar pursuant to N.J.S.A. 40:61-22.20 are unreasonable and discriminatory to the beachgoing public, and therefore, must be revised commencing with the 1990 summer season.
The Public Advocate, as a remedy, suggests that there be a test period during which time this court order that the beach admission fee be fixed at a flat rate of "$2" for both weekdays and weekends. However, it is not a judicial function to fix beach admission fees. The court may only determine whether the beach admission fee charges are reasonable under the applicable statute. When the court determines that the fees are unreasonable, it becomes a legislative function to fix the reasonable fee. See In re Intrastate Industrial Sand Rates, supra, 66 N.J. at 19, 327 A.2d 427; Automatic Merchandising Council v. Township of Edison, 102 N.J. 125, 127, 506 A.2d 352 (1986). When a court invalidates a license fee ordinance as excessive, it may not then set the proper fee because to do so would be an intrusion into the legislative prerogative. Automatic Merchandising Council, 102 N.J. at 127, 506 A.2d 352.
The Court in In re Intrastate Industrial Sand Rates, supra, quoting Chief Justice Gummere stated:
The power to fix rates is not a judicial function, but a legislative one, and the state has created the Board of Public Utility Commissioners as its agent for that purpose. An attempt by the Supreme Court to fix a rate is in its essence an attempt to exercise a sovereign power which has not been delegated to it by the state, but which presides solely in the legislative and executive branches of the government. [66 N.J. at 19-20, 327 A.2d 427]
It is, however, the function of this court to interpret the language set forth in N.J.S.A. 40:61-22.20 and to define what costs, if any, Belmar may allocate to its beachfront related expenses. The Supreme Court in Bor. of Neptune City v. Bor. of Avon-by-the-Sea, supra, specified the legitimate costs that may be allocated by a municipality for its beachfront related expenses.
The allocation of Belmar's beachfront related costs is the major dispute in this case. Relying upon the Supreme Court's *196 decision in Avon, and considering the testimony taken at the time of trial, this court will provide Belmar with further guidance as to which costs may be properly allocated to its beachfront expenses.
The expert witnesses testified that there are 30 separate categories of legitimate costs which may, directly or indirectly, relate to the operation and maintenance of Belmar's beachfront facility. This court shall now review each of the 30 categories of costs and shall determine which costs Belmar may properly allocate to its beachfront related expenses.

1. Police  Salaries and Wages.

Belmar included 90% of the total salary and wage costs of all special police regardless of what they did and when they did it. Special police, used all year to fill in for regular officers who were out sick, were also included by Belmar, as well as those officers called for the Halloween Parade and on St. Patrick's Day.
Bowman included only the identifiable costs for special beach police that patrol the beach, as well as other specials and costs associated with the beachfront as identified by Police Chief Daniel Moynihan. These costs included one roving car post, six special officers directing traffic from 10:00-6:00 p.m., two scooter posts and special assignments posts related to the beachfront.
Belmar allocated the full salary costs for five regular police officers for the entire year, while Bowman included the average salary of two officers on the day-time shift each day for the full summer season. According to Chief Moynihan, there was an average of three officers on duty during the day for three years. The police shift schedule indicates that there are two patrol officers and one supervisory officer on duty at any one time, together with a civilian dispatcher. Bowman allocated two-thirds of the total number of officers working during this period. Additionally, Bowman noted that only 4% or less of the *197 calls for service for the year occurred at or near the beachfront during the time when badges were required.
Belmar allocated 50% of the salary for both civilian police dispatchers and clerical workers while Bowman allocated nothing for this category.
Belmar allocated 75% of the police department's gross overtime, while Bowman allocated the full amount of summer overtime to the beach badge purchaser. Belmar allocated "$4,000" in salary expenses for South Belmar dispatching without acknowledging the reimbursement received by Belmar. At trial, Ormsbee conceded that this was improper. Bowman did not allocate anything to the South Belmar dispatching.
The court rejects Belmar's allocations for this category as overbroad, speculative, and unsupported by any records; Belmar included non-beach related events such as the Halloween and the St. Patrick's Day Parade in its calculations. The court accepts Bowman's allocations for this category as being credible and reliable. However, the number of car posts, number of special officers and assignments related to the beach are subject to change from time to time depending upon need.

2. Beachfront Operating & Cleaning  Salaries and Wages.

In defining this amount, Belmar used anticipated budget amounts rather than actual expenditures. Bowman allocated 100% of the actual salaries of all part-time summer employees hired for the beachfront. These include the beach supervisor and assistant, ticket sellers, lifeguards, gate persons, locker attendants, laborers, and lavatory attendants.
The court accepts Bowman's findings.

3. Beachfront Repair & Maintenance  Salaries and Wages.

For this category Belmar merely allocated eight public works employees. Bowman allocated all of the salary of two regular public works employees and all wages of temporary summer employees assigned to the beachfront. Additionally, Bowman *198 allocated four additional public works employees to account for additional beachfront related tasks, as testified to by Superintendent Paul Greco, one-half of the actual full year compensation of the department's equipment operator and 30% of the total mechanics' salaries.
Belmar's allocations are speculative and not based on any facts. The court accepts Bowman's allocations as to which employees should be included in this category, however, the number of employees may change from time to time depending on need.

4. Garbage & Trash Removal  Salaries and Wages.

Belmar included 35% of the total salaries and wages. Included in this figure were costs related to summer rentals in Belmar as well as changes in the summer season. Bowman's allocations included the total employee hours required for the beach, boardwalk and Ocean Avenue pick-ups multiplied by the hourly rate of compensation. In addition, Bowman included an allocation for summer overtime.
The court accepts Bowman's allocations for this category and finds that Belmar arbitrarily allocated 35% of the total salary and wages to the beach badge purchaser.

5. Municipal Court  Salaries and Wages.

Both parties agree, and this court finds, that allocation of municipal court expenses is improper especially since the revenues exceed the costs in this category.

6. Administrative  Salaries and Wages.

Bowman includes two administrative staff persons who generally performed beachfront related administrative functions. All of their actual salary and wages were included in the allocation. Bowman did not include Ormsbee's salary since he would receive the same salary with or without the beachfront.
*199 The court finds that the administrative staff required for the running of the beach utility, if continued, should be included in this category.

7. Construction Code, Fire & Board of Health  Salaries and Wages.

Both parties agree, and the court finds, that the expenses in this category should not be allocated to the beach badge purchaser since the borough generates revenue by charging a fee.

8. Parks & Recreation  Salaries and Wages.

Belmar allocated 20% of the salaries of parks and playground employees, and 10% of the salaries of recreation employees. Bowman allocated nothing for this category since these are not beachfront related activities.
The court accepts Bowman's conclusion as to those facilities not located on the beach, but finds that any recreation facility provided on the beach for use by the beach badge purchaser must be included in the beach budget.

9. Parking Meter Maintenance  Salaries and Wages.

Belmar's and Bowman's figures were identical for the category, and as such, the court accepts both Bowman's and Belmar's figures.

10. Police  Other Expenses.

Belmar had no separate allocation for this category. Bowman analyzed all of the direct and indirect beachfront related other expenses for the police department. For summer clothing, as a direct cost, Bowman calculated its allocation by multiplying the applicable summer clothing allowance for each year by the number of special beach police officers.
Belmar did not make any separate allocation for traffic and paint supplies, however, Bowman allocated 100% of these costs *200 to the beachfront since they are related to the summer parking lines.
Belmar did not segregate the expenses for ammunition supplies; Bowman adopted Chief Moynihan's estimate that 50% of all ammunition expenses were beachfront related.
Belmar did not segregate the expenses category for psychological testing; Bowman allocated "$300" for each new special police recruit who would be used at the beachfront.
Belmar used a 40% figure to allocate the entire "other expense" budget line, while indirect costs were allocated by Bowman based upon the ratio of indirect police beachfront salaries to total police salary costs.
For police vehicles, Belmar allocated 100% of the cost of acquiring all police cars. Bowman based its figures on 2 factors: (1) their useful life; and (2) the extent of their beachfront usage.
The court accepts Bowman's findings for summer clothing, but also finds the remainder of Bowman's allocations in this category to be too conservative. As such, this court finds that traffic and painting supplies which are used along Ocean Avenue should be allocated to the beach. Ammunition supplies are not to be charged to the beachgoer. Psychological testing, or any expenses incurred in the hiring of special police, are to be included in the beach budget. Furthermore, two vehicles amortized over a three-year period are to be included in the category for police vehicles.

11. Beachfront Operation & Cleaning  Other Expenses.

Belmar used raw numbers from the budget expenditure line for this category, while Bowman took the actual expenditures charged each year against the budget line entitled "bathing beach-other expenses" and adjusted these figures to identify the appropriate charges to beachgoers for each year. For example, for 1985, Bowman removed a "$3,000" charge for a lifeboat, and recategorized it under capital costs, to reflect its *201 useful life. For 1985, the costs of two vehicles were also recategorized as capital costs; and in 1986 a once-only "$20,000" charge for water and sewer usage was eliminated.
The court finds that the purchase price and maintenance of two vehicles used at the beachfront should be included in accordance with Bowman's findings.

12. Beachfront Repairs & Maintenance  Other Expenses.

Belmar allocated the full amount of these charges to the beach badge purchaser.
Bowman included all non-salary and wage expenses of the public works department which are related to the beachfront. Bowman also included all beachfront related costs under beachfront maintenance with the exception of a "$770" lighting charge in 1985 which was not considered to be beachfront related.
For public buildings, Belmar included the costs associated with the Ninth Street Mall in its allocations, while Bowman allocated 100% of the "other expense" costs associated with the beachfront pavilion, such as tile, paint and a return air system.
Belmar did not separately allocate the direct costs for road repair and maintenance, while Bowman's allocation for this category reflects the clothing allowance for the staff assigned to the beachfront.
Belmar applied the arbitrary 30% figure against these indirect costs, while Bowman's allocations for the indirect "other expenses" relating to road repairs and maintenance were proportional to the allocation of salary costs for the beachfront.
Belmar allocated 30% of all of the charges for equipment maintenance. Bowman applied the 30% indirect labor factor that it had used for salaries and wages under that category.
The court finds that the "$770" boardwalk lighting charge should not be allocated to the beach badge purchaser. The boardwalk during the evening hours is not an appendage of the *202 beach, but rather an attraction in and of itself for nighttime entertainment. While lighting of the boardwalk should not be included, boardwalk repairs are a permissible allocation.
Additionally, the court finds that as a result of the increased volume of traffic on the streets during the summer months, Belmar is entitled to allocate a small percentage of road repair costs. Belmar may fix a fair and reasonable amount.

13. Garbage and Trash Removal  Other Expenses.

Belmar used an arbitrary 35% figure for its allocation.
Bowman's allocations for the "other expenses" relating to garbage and trash removal were calculated by identifying all "other expense" charges, eliminating the charges for capital equipment and sanitary landfill, and allocating the remainder in proportion to the allocation of salaries and wages for this category.
The court finds that allocating 35% to the beach badge purchaser is unreasonable. The summer garbage collection season amounts to approximately 8 out of 52 weeks. Not all of the summer collection is from the beach alone; the majority of the additional garbage is from summer rentals. Between 5-7% of this cost is a more realistic amount to allocate to the beachfront.

14. Legal Services & Municipal Court  Other Expenses.

Belmar allocated 100% of all the bar related expenses for legal services as well as certain unidentifiable other legal services.
Bowman allocated 100% of all legal service charges related to beach ordinances, bids and contracts related to the beachfront, and lawsuits resulting from beach injuries. No allocation was made for charges for legal services related to the bars and other licensed premises.
*203 None of the "other expenses" related to the municipal court were allocated by Bowman for the same reason that none of its salary and wage expenses were allocated.
Belmar conceded that its 60% allocation was inappropriate.
The court accepts Bowman's findings.

15. Boardwalk Lighting  Other Expenses.

Belmar allocated a flat 15% of the total budgetary expenditures, each year, for street lighting for the entire municipality.
Bowman allocated nothing for boardwalk lighting because it did not consider these expenditures to be properly chargeable to the beach badge purchaser.
The court accepts Bowman's findings.

16. Insurance  Other Expenses.

Belmar gave no explanation for its allocation while Bowman allocated workers' compensation coverage in proportion to its calculation of the borough's total beachfront related salaries and wages.
Belmar used a 30% figure supplied by Ormsbee for the cost of coverage for contractor's equipment. Bowman allocated it in proportion to the borough's use of such equipment for beachfront related purposes.
Belmar gave no explanation for the cost of auto and other vehicle coverage, while Bowman allocated it in proportion to the borough's use of such vehicles for beachfront related purposes.
Belmar gave no explanation for the cost of police liability coverage. Bowman allocated it in proportion to the overall police salary and wage cost related to the beachfront.
Belmar gave no explanation for property and liability insurance costs. These costs were allocated by Bowman in accordance *204 with figures supplied by William Hooper, the borough's insurance agent, with a modified seasonal adjustment.
The court accepts Bowman's findings.

17. Engineering Fees  Other Expenses.

Belmar's allocations were based on an arbitrary 25% figure.
Bowman's allocations for engineering fees were based on its detailed review of all invoices for services. The invoices which reflected engineering services in any way related to the beachfront were allocated 100%.
The court accepts Bowman's findings.

18. Hospitalization Costs.

Belmar gave no explanation for this category, while Bowman based its allocations on its identification of the actual monthly premiums paid on behalf of all beachfront related employees. The allocations were made in proportion to employees beachfront related salaries and wages.
The court accepts Bowman's findings.

19, 20, 21. Social Security, PERS and PFRS.

Belmar charged the beach badge purchaser with 60% of the borough's total cost for social security in both 1984 and 1985. Bowman's allocation was based on the applicable annual employer's contribution rate multiplied by the borough's total beach related salaries and wages.
Belmar gave no explanation for its PERS (Public Employee's Retirement System) allocation. Bowman applied the applicable employer contribution rate to the borough's total eligible beachfront related salaries.
Belmar allocated nothing for PFRS (Police and Fireman's Retirement System) while Bowman applied the applicable employer *205 contribution rate to the borough's total eligible beachfront related police salary and wages.
The court accepts Bowman's findings.

22. Sanitary Landfill.

Belmar allocated 35% of the borough's total sanitary landfill charges.
Bowman's allocations were based upon its identification of incremental summer costs for these charges.
The court finds that a reasonable formula should be devised focusing on the actual use by the beach.

23. Parks  Other Expenses.

Belmar allocated 20% of the "other expenses" for parks and playgrounds and 25% of such charges for recreation.
Bowman did not allocate any "other expenses" since they were not related to the beachfront.
The court accepts Bowman's findings.

24. Storm Damage  Other Expenses.

Belmar recognized the entire "$200,000" budgetary appropriation for storm damage in 1984 despite the fact that only "$118,989.53" was spent on the beachfront, and despite the fact that the borough was reimbursed for all but 12.5% of these costs.
Bowman allocated nothing for this category but recognized actual storm damage costs under category 28, the debt service category.
The court finds that only the actual loss to the beach, less any state or federal reimbursements, should be included in this category.

*206 25. Administrative  Other Expenses.

Belmar allocated 20% of the total "other expenses" for this category.
Bowman allocated the "other expenses" related to the administrative department in two steps. First, it identified direct beachfront related costs and allocated 100% of such costs and second, it allocated the remaining miscellaneous "other expenses" in proportion to the beachfront related salaries and wages for this department.
The court accepts Bowman's findings.

26. Construction Code, Fire, Board of Health  Other Expenses.

Belmar allocated 50% of these charges for the board of health and nothing for either construction code or fire inspection.
Bowman allocated nothing in this category for the same reasons that it did not do so for this category's salary and wage costs.
The court accepts Bowman's findings.

27. Parking Meter Maintenance  Other Expenses.

Both parties agree to this category, however, only parking meter maintenance on Ocean Avenue should be included.

28. Debt Services.

Belmar allocated 11% for principal and 8% for interest across each of the three years.
Bowman identified all beachfront related projects funded by both long-term bond sales and short-term bond appreciation notes (BAN). Additionally, Bowman calculated the percentage of the proceeds from each bond and BAN sale represented by beachfront related projects. Next, Bowman determined the total annual principal and interest costs related to the beachfront for all outstanding long-term bond issues. Finally, Bowman *207 determined that Belmar incurred no beachfront related costs for BANs, since the only BANs issued were for nonbeachfront related purposes.
Bowman's year-by-year analysis resulted in allocating between 5.8% and 7.1% for principal and between 4.9% and 9.1% for interest.
The court accepts Bowman's findings.

29. Equipment Reserves.

Belmar allocated nothing for this category, however, it allocated 100% of the full purchase price for equipment in the year of purchase under category 30, capital costs.
Bowman identified 23 different kinds of beachfront related equipment used by the borough. A three or five year use for life was assumed for this equipment in accordance with New Jersey's recognized "minimum period of usefulness" set forth in N.J.S.A. 40A:2-21.
The court accepts Bowman's findings.

30. Capital Costs.

Belmar charged 100% of all costs for the year in which they were incurred.
Bowman only included the cost of boardwalk and pavilion improvements over a 15-year period.
The court accepts Bowman's findings.
Belmar shall review and revise its beach admission fee schedule in accordance with the findings of the court in this opinion. In fixing its future reasonable beach admission fees, Belmar shall allocate its legitimate beachfront costs as determined by the court in this opinion. In revising its daily beach admission fee, Belmar shall fix a single daily admission fee for both weekdays and weekends so as not to discriminate against the weekend beachgoer. Belmar, in fixing the seasonal fee, shall *208 ensure that the fee fixed for a seasonal admission fee does not discriminate against the daily beachgoer.
Commencing with the 1990 summer season, Belmar shall maintain complete, accurate, and traceable records documenting the costs relating to its beachfront facilities. Belmar shall maintain a separate beach account in which all revenues collected by the borough, from beach admission fees and any other beach use fees, shall be deposited, and from which all expenditures for beach related costs will be paid.
Belmar's revised beach admission fee schedule shall be adopted and published prior to February 1, 1990.
This case, as well as the three other beachfront cases in Monmouth County, have been pending for more than two years. They have received extensive media publicity,[4] and in fact, the New Jersey Legislature, in Senate Bill 1374 (1989), is now considering legislation to amend N.J.S.A. 40:61-22.20.[5]
This court, however, in determining which costs a municipality may legitimately allocate to its beachfront expenses is bound by the Supreme Court's interpretation of N.J.S.A. 40:61-22.20 in Avon. The Supreme Court's interpretation in Avon as to what costs may be allocated to Belmar is much broader than Senate Bill 1374.
*209 The interpretation of the existing statute, N.J.S.A. 40:61-22.20, has resulted in numerous costly lawsuits in both Monmouth and Ocean Counties. Beachfront municipalities have been at odds over what the Legislature meant by reasonable fees and legitimate costs associated with beachfront expenses. Since the fixing of beach admission fees is a legislative function, future legislative action may be helpful in resolving these issues.

VII.

Conclusion.
For the reasons previously stated, the beach admission fees charged by the Borough of Belmar are unreasonable, arbitrary and discriminatory under both N.J.S.A. 40:61-22.20 and Avon. As such, they shall be revised for the 1990 summer season in accordance with the guidelines set forth in this opinion.
NOTES
[1] A three-year test period including 1984, 1985 and 1986 was utilized to determine Belmar's beachfront related expenditures.
[2] The cassette tape of the October 7, 1985 commissioners' agenda meeting was marked in evidence. The tape revealed the commissioners' concern over the number of people coming to the Belmar beach and the potential problems that would result from such a large crowd.
[3] Trial testimony revealed that Belmar estimated its costs by assuming that Belmar was moved 22 miles inland. It then allocated a wide range of municipal expenses, both during the summer and the off season, to the summer beach badge purchaser on the ground that such expenses would not exist if Belmar were an inland community.
[4] In 1987, the Public Advocate filed suits against Avon, Belmar, Sea Girt, and Spring Lake challenging the reasonableness of the beach admission fees. In all of these cases, with the exception of Belmar, a settlement for a test period at "$2.50" daily admission fee was reached.
[5] On May 4, 1989, by a vote of 24-4, the New Jersey State Senate passed Senate Bill 1374 (1989), "The Fair Beaches Act." This bill is presently pending in the Municipal Government Committee awaiting Assembly action. In essence, the bill provides for a "$2" cap on beach admission fees and limits the expenses which may be recovered by the municipality to providing beach litter control and disposal, repairing and maintaining only those boardwalks which provide access to the beach, and providing lifesaving and lifeguard services in the beach area. The bill also requires that a separate fund be established and maintained by each municipality in order that the beach fee collections and expenditures may be accounted for separately.