Eric WEISS, Plaintiff,

v.

Stephen WEISS, Defendant.

No. 91 CIV. 5115(KMW)(MHD).

United States District Court,
S.D. New York.

May 8, 1997.

Paul Sarno, New York City.

Stephen N. Dermer, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, NJ.

## MEMORANDUM & ORDER

DOLINGER, United States Magistrate Judge.

In 1991, plaintiff Eric Weiss commenced this lawsuit against his adoptive father, Stephen Weiss, and others.[1] Plaintiff challenged his father's handling of assets that the father had placed in trust or in various Uniform Gift to Minors Act ("UGMA") accounts for the benefit of Eric. Following a trial at which the jury returned verdicts in favor of Stephen Weiss on all of plaintiff's claims, the court granted judgment as a matter of law for plaintiff with respect to liability on one claim and scheduled a non-jury trial on damages. *Weiss v. Weiss*, 1996 WL 91641, at *21–23 (S.D.N.Y. March 4, 1996).[2]

We have conducted the damages trial and now direct that judgment be entered for plaintiff on his claim for early termination of a so-called Clifford Trust, in the amount of $12,047.61 in principal and $1,362.63 in pre-judgment interest. In all other respects, the complaint will be dismissed.

### A. The Nature of the Surviving Claim

Among the many complaints voiced by plaintiff concerning his father was a claim based on the alleged early closure of a Clifford Trust that Stephen Weiss had established in 1978 for Eric's benefit. According to plaintiff, the trust instrument required Stephen Weiss, as trustee, to keep the trust open for 121 months, and further provided that any assets placed in the trust after its initial creation were to be treated as a separate trust for purposes of measuring when the trust could be closed. Plaintiff further alleged that when his father closed the trust in July 1988, it contained assets, in the form of shares of stock, that had been added to the trust in 1979 and 1986.

The evidence at trial bore out these contentions. Moreover, the evidence demonstrated beyond meaningful dispute that Stephen Weiss had profited by some undetermined amount as a result of his failure to retain these assets in the trust. Accordingly, the court determined that, despite the jury's verdict to the contrary, plaintiff had established the basis for a claim for breach of fiduciary duty against his father in this one respect. *Id.* at * 22 & n. 27.

The theoretical basis for the claim is set out at some length in the court's post-trial opinion. Briefly stated, the trust instrument unambiguously required that the trust be kept open for a specified period for after-acquired assets, and defendant violated that explicit provision. That violation constituted a breach of trust even though the record amply demonstrates that defendant acted without intent to commit the violation. (*See* RESTATEMENT (SECOND) OF TRUSTS § 201, cmts. a & c, illus. 2–3 (1959)). *See also Dill v. Boston Safe Deposit & Trust Co.*, 343 Mass. 97, 100–01, 175 N.E.2d 911, 913 (1961).

The trust instrument did contain a so-called exculpatory provision, which stated that: "Trustee shall be relieved from all responsibility or liability for any loss to the trust properties which may occur because of errors of judgment and shall be liable only for failure to act in good faith." (Pl.'s Ex. 28A, ¶ 10). Despite the language excluding trustee liability for good-faith acts, the courts recognize certain exceptions to this protective shield erected around the trustee. Most pertinently, as noted in our prior opinion, this language "does not protect a trustee who

---

**1.** All defendants except for Stephen Weiss have been dismissed from the suit.

**2.** At the time of the first trial, the parties stipulated that damages would be reserved for a bench trial.

commits a breach of trust 'in bad faith or intentionally or with reckless indifference to the interest of the beneficiary,' nor does it relieve a trustee 'of liability for any profit which the trustee has derived from a breach of trust.'" *Weiss* at *22 (quoting Restatement § 222(2)). *See also New England Trust Co. v. Triggs*, 334 Mass. 324, 340–41, 135 N.E.2d 541, 550–51 (1956).

Since there is no question that defendant's early termination of a portion of the trust yielded some "profit" to him, we concluded in our prior opinion that the jury had erred in finding that plaintiff had not demonstrated that Stephen Weiss had profited. This formed the basis for entry of judgment for plaintiff as to liability on this claim, and led to the subsequent, brief bench trial on damages.

From the wording of the cited Restatement provision, we are directed to assess the extent of the profit realized by defendant as a consequence of his breach of the trust. It is to this matter that we now turn.

### B. *Damages*

#### 1. *The 1979 Assets*

■ The Clifford Trust provided that the income from the trust was to be used for the benefit of Eric Weiss. The corpus was to remain in the trust for the requisite period, and, upon termination of the trust, was to revert back to the grantor, Stephen Weiss. Since Eric was entitled only to the benefit of the income, the early termination profited defendant in one evident way—the stock dividends paid, after termination, on the shares that had been in the trust apparently went to Stephen Weiss and not for the benefit of Eric.

With the exception of shares held in Datascope Corporation, which are the subject of a separate analysis, it appears that when Stephen Weiss terminated the trust in September 1988, he assumed title to shares of thirteen corporations that represented assets that he had added to the trust between September 1978 and December 1979. During the period from September 1988 until January 1990—the latest date at which the 121–month period for these assets expired—Stephen Weiss received dividends on both these shares and shares that had been delivered to the trust pursuant to dividend reinvestment plans that he maintained as part of his investment strategy.

■ In calculating the defendant's recoverable profits on these shares, we exclude from consideration any dividends paid on shares that had been received by the trust in lieu of cash dividends. In doing so, we reject plaintiff's argument that we should count those dividends as "profits" because the dividend reinvestment shares, although income, were not used for plaintiff's benefit or as reimbursement to Stephen Weiss for payments on behalf of his son. The short answer to this contention is that the jury found that all income earned by the trust—including therefore these dividend reinvestment shares—was utilized by defendant either for his son or as reimbursement for payments made for his son's benefit.[3]

Given this limitation, we calculate defendant's profits flowing from the early termination of the trust—exclusive of the Datascope stock—as follows:

| Company | Dividends |
|---|---|
| AllTel | $ 364.50 |
| Ameritech | $ 47.25 |
| AT & T | $ 42.60 |
| Bell Atlantic | $ 42.84 |
| Boston Edison | $ 546.00 |
| Centerior Energy | $ 400.00 |
| Central & Southwest | $ 512.00 |
| Houston Industries | $ 888.00 |
| Lomas & Nettleton | $ 444.00 |
| NYNEX | $ 42.42 |
| Oklahoma Gas & Electric | $ 171.00 |
| Sierra Pacific | $ 225.00 |
| United Telecommunications | $ 432.00 |
| TOTAL | $4,157.61 |

■ In seeking to reduce this total, defendant argues that he is entitled to a "credit"

---

**3.** We also reject plaintiff's argument that the record does not sufficiently reflect which shares found in the trust were purchased by Stephen Weiss with assets newly added to the trust and which were received under the various dividend reinvestment programs in which he participated. The stock records and his testimony give an adequate basis for making that determination despite his less-than-ideal record-keeping as trustee.

for dividends received from two companies—Southwest Public Service and Central & Southwest—because those shares had been purchased more than 121 months before the termination of the trust. According to defendant, he could have terminated the trust with respect to those shares before September 1988 and thereby appropriated for himself $887.50 in dividends received before the trust termination.

We see no basis for this argument. As trustee, defendant was authorized to keep the trust open for a period in excess of 121 months, and he did so with respect to these shares. That decision does not work to deprive the beneficiary of his right to the trust income for as long as the trust is open. Accordingly, we decline to reduce the profit figure that we have calculated.

If defendant had kept the trust open during the required period, he would have been obliged to use the dividends received then for the benefit of Eric Weiss or to pay those funds to plaintiff upon termination of the trust. Instead, he received these payments and used them for his own purposes. This sum thus represents a "profit" to Stephen Weiss, for which he is liable to plaintiff.

■ Apart from challenging the calculation of his "profit," defendant seeks to preclude any award whatever. He asserts that, subsequent to the termination of the trust, he continued to pay for expenses generated by his son, and that these payments offset any profits that he may have derived from the early termination of the trust. He also appears to argue that he would not have paid these expenses if he had been precluded from closing the trust in September 1988, and he further suggests that the jury verdicts endorsed these assertions and are thus binding on the court.

These assertions are baseless. The evidence at the first trial, which is incorporated in the record before us now, indicates that Stephen Weiss paid for various expenses generated by his son during and after 1988. It does not follow, however, that he is therefore entitled to retain the profits flowing from his breach of trust with respect to the Clifford Trust.

At the jury trial, Stephen Weiss took the position that his post–1988 payments should be taken into consideration in determining whether he had applied all of the assets and income of the UGMA accounts and all of the income of the Clifford Trust to benefit his son. The jury was given that issue and found in his favor in three respects. First, it found that defendant had used all of the assets of the UGMA accounts "to reimburse himself for expenditures made for the benefit of Eric other than basic support items...." (Verdict 2(a)). Second, it found that if Stephen Weiss had turned all of the UGMA assets over to his son when he turned 21, defendant "would not have paid for the benefits that he testified to having provided to Eric after his 21st birthday." (Verdict 2(b)).

Third, with respect to the trust, the jury answered in the affirmative the question whether defendant had "used all of the income from the Trust to reimburse himself for expenditures for Eric's benefit other than nonreimbursable basic support items...." (Verdict 3(a)). The jury was not called upon, however, to determine whether income derived by defendant from trust shares after the trust had been terminated went to pay for Eric's expenses or represented reimbursements by Stephen Weiss for prior expenditures for Eric's benefit.

■ Moreover, the current record does not permit us to make such a calculation. Defendant, by his failure to retain detailed records of expenditures on Eric's behalf as well as precise records of trust and UGMA assets and income, has virtually precluded any conclusion that the post–1988 payments for Eric were not completely offset by the defendant's appropriation of UGMA assets and income and pre-termination trust income. Since it was defendant's obligation as fiduciary to keep these records, *see, e.g., In re Herr,* 22 N.J. 276, 288, 125 A.2d 706, 712 (N.J.1956); *Slocum v. Borough of Belmar,* 238 N.J.Super. 179, 187, 569 A.2d 312, 317 (N.J.Super. Ct. Law Div.1989), the gaps in the documentation must be read in plaintiff's favor.

It also bears noting that even under defendant's own calculation, the sums that he assertedly spent on his son's behalf only

minimally exceeded the amounts that he appropriated from the UGMA accounts and the trust income. Since plaintiff's calculation of expenditures appears to have been somewhat exaggerated, particularly with regard to school expenses, we see no basis for finding that the post-termination income from the trust shares was not "profit" to him.[4]

■ There remains a question as to whether, in calculating defendant's "profits" from the breach of trust, he is entitled to a credit for any taxes that he may have paid on those profits. Not surprisingly, the parties have not cited, and we have not located, any controlling authority on this point. We may, however, analogize to the law regarding profit awards in other contexts and conclude that federal income taxes actually paid may be offset from profits in the absence of "conscious and deliberate wrongdoing."[5] *L.P. Larson Jr., Co. v. Wm. Wrigley Jr., Co.,* 277 U.S. 97, 99–100, 48 S.Ct. 449, 449, 72 L.Ed. 800 (1928)(trademark). *See also W.E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 664 (2d Cir.1970) (trademark); *Alfred Bell & Co., Ltd. v. Catalda Fine Arts,* 191 F.2d 99, 105 (2d Cir.1951) (copyright); *Sheldon v. Metro–Goldwyn Pictures Corp.,* 106 F.2d 45, 53 (2d Cir.1939), *aff'd,* 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940) (copyright); *Stromberg Motor Devices Co. v. Zenith–Detroit Corp.,* 73 F.2d 62, 64 (2d Cir.1934), *cert. dismissed,* 294 U.S. 735, 55 S.Ct. 509, 79 L.Ed. 1263 (1935) (patent); *Sheldon v. Moredall Realty Corp.,* 29 F.Supp. 729, 730 (S.D.N.Y.1939) (copyright). As was conclusively established at trial, in terminating the Clifford Trust, Stephen Weiss "was acting in the good-faith belief that the termination . . . was permissible" (Jury Verdict 4(a)), and therefore did not engage in any conscious or deliberate wrongdoing.

■ In allowing such an offset, however, the courts generally require a defendant to prove the amount of taxes paid with some specificity. *See, e.g., MacBeth Evans Glass Co. v. L.E. Smith Glass Co.,* 23 F.2d 459, 463–64 (3d Cir.1927); *USM Corp.,* 467 N.E.2d at 1276–77; *Fidelity Mgmt. & Res. Co.,* 662 N.E.2d at 705. For example, in *MacBeth Evans Glass Co.,* the Third Circuit required the defendant to prove the amount of income tax paid "computed in the ratio of infringing profits to the gross profits of the business" and required the defendant to post a bond in the amount of the anticipated tax refund, made payable to the plaintiff. *Id.* at 463. In *Fidelity Mgmt. & Res. Co.,* the court did not allow defendant to offset federal income taxes because, *inter alia,* she had not proved that she had paid the tax or provided an accounting for any refund that she might receive. *Id.* at 705.

In this case, Stephen Weiss has offered only the most general testimony, to the effect that in 1988 and 1989 he was in a 30 "plus" tax bracket, but did not "recall exactly" what his tax bracket was and that in the period from 1991 to 1995 his tax bracket was "someplace between 26 and 28 percent." (Transcript dated Aug. 7, 1996 at 59). According to Mr. Weiss, his tax bracket in 1990 was "substantially higher", as he had realized a large capital gain from the sale of his business. *Id.* at 60. This testimony is plainly insufficient to carry his burden, and accordingly we make no adjustment in the gross profit figure to account for taxes paid.

### 2. The Datascope Shares

In 1986, defendant added $14,613.00 to the corpus of the trust, and used those funds to purchase 500 shares of Datascope Corporation. When he terminated the trust, he retained the Datascope stock, which had increased from 500 to 750 shares as a result of a stock split. In 1991, he sold those shares

---

4. Under these circumstances, we need not reach the question of whether, as a legal matter, defendant could shield his profits from a breach-of-trust claim on the basis that he had voluntarily paid for certain expenses of his son. At the very least we would be required to determine whether, if he had known that he must keep the trust open longer, he would have declined to make such payments. We see nothing in the record that would answer that question.

5. Other courts have allowed the offset of federal income taxes even in the case of willful wrongdoing. *See, e.g., USM Corp. v. Marson Fastener Corp.,* 392 Mass. 334, 467 N.E.2d 1271, 1280–81 (1984) (trade secrets); *Fidelity Mgmt. & Res. Co. v. Ostrander,* 40 Mass.App.Ct. 195, 662 N.E.2d 699, 705 (1995) (disgorgement of profits from illegal investments).

and deposited the cash in his account to await further transactions.

Given the 121–month requirement of the trust instrument, it is apparent that defendant was required to hold these assets in trust until 1996, and that his 1988 termination of the trust was, in this respect, premature. Accordingly, plaintiff is entitled to an award of any profits derived by defendant from this breach of trust.

Our analysis is complicated, however, because the Datascope stock did not generate any dividends. On the one hand, this means that plaintiff did not realize any "profits," in the form of dividends, while he held this stock from 1988 until 1991. On the other, it gives rise to the argument that if he had held the Datascope shares in the trust without realizing any dividends for this extended period, he would have been in violation of the trust requirement that he invest only in income-generating properties. Under this reasoning, defendant would have been compelled, at some point in time well before 1996, to sell the Datascope shares and reinvest in an income-producing asset, *see* RE-STATEMENT (SECOND) OF TRUSTS §§ 231, 241, and hence plaintiff would have been entitled to receive the benefit of that income.

 The short answer to this contention is that the measure of relief to which the plaintiff is entitled is not the loss to him by virtue of the breach of trust, but rather the profits, if any, earned by the trustee *as a result* of his violation of the terms of the trust instrument. *See id.* at § 222(2). *See also id.* at § 203.[6] Defendant's retention of the Datascope shares until 1991 resulted in no realized profit and hence no award to plaintiff for this period.

Plaintiff alternatively appears to suggest that defendant profited in another way by his retention of the Datascope shares, that is, through the appreciation in the market price of the stock. The implicit point is that the early termination of the trust enabled Stephen Weiss to keep these shares since it eliminated his obligation to place the assets in income-producing property. Since, plaintiff surmises, defendant wanted to retain the Datascope shares to realize expected capital appreciation, any such appreciation should be viewed as "profit." The answer to this analysis, however, is that the evidence reflects that during the period from 1988 until 1991 the shares declined, rather than appreciated, in value, as measured by their market price. (February 1991 PaineWebber Statement—Def.'s Ex. 0000 at p. 2).

 There remains for consideration any profit derived from the money representing the Datascope shares between 1991 and 1996. Defendant reports that he sold those shares on February 20, 1991, and that he cannot trace the flow of the money to other investments or expenditures.

The most reasonable measure of profits, given the absence of direct data, is to look to the performance of investments of the type in which defendant placed the bulk of the trust assets during the ten years in which he controlled the trust—namely, utility companies. As measured by a respected investment service, during the relevant time period, the total return on utility stocks averaged 10.69% per year. (*See* Standard & Poor's Lipper Mutual Fund Profiles, Feb. 1996, Vol. 10, No. 1—Pl.'s Ex. 215 & Def.'s Ex. TTTT at p. 403). This figure, however, includes capital appreciation as well as dividends, and must therefore be adjusted downward since plaintiff was entitled only to the use or benefit of trust income.

Defendant suggests the use of Standard & Poor's Lipper Mutual Fund Profiles, which contains a 12–month "yield figure" reflecting, in effect, dividends and interest income received by the mutual funds and distributed to their shareholders. (*See* Standard & Poor's Lipper Mutual Fund Profiles, Feb. 1992, Vol. 6, No. 1—Def.'s Ex. PPPP at p. 391). In making this calculation, we refer to the annual returns for the years 1991 through 1995, and assume both that all income was rein-

---

6. As noted, the Restatement provides for recovery of profits earned by the trustee through his breach of trust even if the trust instrument contains an exculpatory provision. *See id.* at § 222(2). In the absence of such a provision, the beneficiary may opt to recover his lost profit or the trustee's realized profit. *See id.* at § 205 & cmts. h-i.

vested and that the 1996 rate of return would equal the average of the five previous years. on this basis we arrive at a total estimated profit on the value of the Datascope shares equal to $7,890.00.

As defendant has again provided insufficient evidence as to the specific amount of federal income tax that he would have paid on this estimated profit, no offset is available.

### 3. *Pre–Judgment Interest*

 Plaintiff is entitled, as part of his damages, to an award of pre-judgment interest. Because the damages referable to the Datascope shares were calculated on the basis of assumed reinvestment of the dividends, no such award is called for with respect to those assets. Accordingly, we address only the interest payable on the dividends actually earned on trust shares after the termination of the trust.

 As noted, the principal figure is $4,157.61. The parties agree that the appropriate rate of interest is derived from New Jersey Court Rule 4:42–11, which specifies annually the governing rate for post-judgment interest. These rates are 8.5% for 1991, 7.5% for 1992, 5.5% for 1993, 3.5% for 1994 and 1995, and 5.5.% for 1996 and 1997, or an average of 5.6%.

In calculating interest, we note that the rule also provides that pre-judgment interest is to run from the later of the date of filing of the complaint or six months after the claim accrued. N.J. Court Rule 4:42–11(b). The claim with respect to these shares accrued in 1988 or 1989 but the complaint was not filed until July 29, 1991, and hence interest should run from that date.

 Application of a 5.6% rate of interest to the principal amount yields simple interest of $236.98 per annum.[7] For the period from July 29, 1991 through April 29, 1997, we calculate accrued pre-judgment interest of $1,362.64.

---

**7.** We calculate simple rather than compound interest in view of our conclusion that defendant did not act in bad faith or with gross negligence. *See, e.g., Wilson v. Great American Industries,* 763

### CONCLUSION

For the reasons stated, we determine that plaintiff's recoverable damages total $12,-047.61 in principal and $1,362.64 in pre-judgment interest, or a total of $13,410.25. Judgment shall be entered accordingly. Each party is to bear his own costs.

F.Supp. 688, 691 (N.D.N.Y.1991); *State ex rel. Matthews v. National Sur. Corp.,* 17 N.J.Super. 137, 141, 85 A.2d 534, 536 (Ct.App.Div.1952).