846 A.2d 659 (2004)
368 N.J. Super. 425
THE TIMES OF TRENTON PUBLISHING CORPORATION, Plaintiff-Appellant,
v.
LAFAYETTE YARD COMMUNITY DEVELOPMENT CORPORATION, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued February 24, 2004.
Decided April 30, 2004.
*660 Keith J. Miller, Newark, argued the cause for appellant (Robinson & Livelli, attorneys; Mr. Miller, on the brief).
Rocky L. Peterson argued the cause for respondent (Hill, Wallack, attorneys; Mr. Peterson and Dakar R. Ross, on the brief).
Before Judges CIANCIA, PARKER and R.B. COLEMAN.
The opinion of the court was delivered by
PARKER, J.A.D.
In this case of first impression, the principal issue is whether a private, non-profit entity designated by a municipality as a redeveloper of property donated to it by the municipality is a "public body" within the meaning of the Open Public Meetings Act (OPMA), N.J.S.A. 10:4-6 to -21, thereby requiring the Board of Trustees of the redeveloper to open its meetings to the public. The secondary issue is whether the redeveloper is a "public agency" subject to the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13. We hold that under the facts presented, the redeveloper is a "public body" and a "public agency" subject to OPMA and OPRA.
Plaintiff, The Times of Trenton (Times), is a Mercer County newspaper, circulated throughout the State. Defendant, Lafayette Yard Development Corporation (Lafayette Yard), was designated by the City of Trenton (City) to redevelop a 3.1 acre tract of land donated to it by the City. The redevelopment project consists of a 197-room hotel and conference center with on-site parking operated by Marriott Hotels.[1]
Early in March 2002, Times reporter, Albert Raboteau (Raboteau), was barred from attending defendant's Board meeting. When Raboteau claimed that he had a right to attend the meeting under OPMA, Trenton Mayor Douglas H. Palmer informed him that Lafayette Yard was a private organization and OPMA did not apply.
Counsel for the parties then negotiated an agreement to permit Raboteau to attend the monthly Board meetings. Pursuant to the agreement, Raboteau appeared at the June 27, 2002 meeting. Board Chair Alan Mallach ordered Raboteau to leave the room, however, while the Board discussed a "pending financial transaction." At the August 29, 2002 meeting, Raboteau was again ordered to leave the room.
After the reporter was asked to leave two consecutive Board meetings and was denied access to the meeting minutes, the Times filed a complaint in lieu of prerogative writs seeking to (1) enjoin the Board from closing its meetings to the public in violation of OPMA; and (2) require the Board to make the minutes of all past and future Board meetings available for public inspection as required by OPMA. The trial judge found that defendant was neither a "public body" within the meaning of OPMA nor a "public agency" within the meaning of OPRA and dismissed the complaint.

*661 I
Lafayette Yard was incorporated on June 8, 1998, as a private, non-profit corporation, pursuant to the New Jersey Nonprofit Corporation Act, N.J.S.A. 15A:1-1 to 16-2, Internal Revenue Service (IRS) Revenue Ruling 63-20 and IRS Revenue Procedure 82-26, for the express purpose of redeveloping 3.1 acres of property donated to it by the City. The Board is appointed by the Mayor and City Council and the property will revert to the City after completion of the project and repayment of the debt. Lafayette Yard's certificate of incorporation states in part:
The purpose of the Corporation is to assist the City of Trenton (the "City"), the Trenton Parking Authority and the State of New Jersey to provide for the redevelopment of a 3.1 acre site known as the Lafayette Yard property located in the City, initially consisting of a hotel, conference center and parking facility.
....
The number of Trustees of this Corporation shall be seven (7). The original five... have been designated by the Mayor of the City. The remaining two Trustees will be designated by the City Council at a later date.
....
The duration of the Corporation shall be perpetual, except that consistent with the provisions of Internal Revenue Service Revenue Ruling 63-20 and Revenue Procedure 82-26, title to all property of the Corporation shall be conveyed to the City upon payment or provision therefore of all indebtedness incurred by the Corporation for the purposes described herein.
In the event of dissolution or liquidation, the certificate of incorporation provides that "the Board of Trustees shall, after paying or making provision for the payment of all the lawful debts and liabilities of the Corporation, distribute all the assets [to] the City."
The bylaws mirror the certificate of incorporation and provide that "[t]he property and affairs of the Corporation shall be controlled by, and its government shall be vested in, a Board of Trustees," appointed by the Mayor and City Council. The bylaws state that the Board members, who serve without compensation, shall include residents of the City, representatives of community, civic, business and other organizations in or out of the City, and anyone else interested in improving the quality of life of the City. The bylaws further provide that any trustee may be removed for cause by either a majority vote of the Board or "by a majority vote of the City Council ... [and] approved by the Mayor of the City."
On July 1, 1999, the City adopted Resolution No. 99-527, approving the transfer of the 3.1 acre tract to Lafayette Yard, along with the vacated portion of the right-of-way of Peace Street (Memorial Drive). The resolution provided in part:
WHEREAS, the City of Trenton has identified the development of a downtown hotel and conference center as a key element in the city's economic development strategy; and
WHEREAS, to this end, the City has amended the John Fitch Way 1 Redevelopment Plan to permit the Lafayette Yard site (the "Property") to be used for development of the hotel and conference center and associated structured parking; and
....
WHEREAS, the City of Trenton currently owns or is in the process of acquiring the Property....
....

*662 RESOLVED, by the City Council of the City of Trenton that:
1. It is determined that [defendant] possesses the qualifications and the financing mechanisms are available which are necessary to acquire and redevelop the Property in accordance with the Redevelopment Plan for the Area; and
2. [Defendant] or its successors and/or assigns are hereby designated as the redeveloper of the above-referenced Property, and are hereby granted the exclusive right to acquire said Property... from the City of Trenton on such terms and conditions as the City of Trenton and the purchaser may establish by mutual agreement ...; and
....
4. The purchase price is $1.00....
In accordance with the Resolution, the City entered into a Disposition Agreement with Lafayette Yard that designated the City as the "agency" and defendant as the "redeveloper" pursuant to the Local Redevelopment and Housing Law (Redevelopment Law), N.J.S.A. 40A:12A-1 to -49. The Disposition Agreement stated that the City had undertaken the redevelopment project "in furtherance of the objectives of [the Redevelopment Law] ... and in accordance with a duly adopted Redevelopment Plan." The agreement stated:
[T]hat the redevelopment of the Property pursuant to this Agreement, and the fulfillment generally of this Agreement, are in the best interests of the City of Trenton and the health, safety, and welfare of its residents, and in accordance with the public purposes and provisions of all applicable Federal, State and local laws, ordinances and regulations under which the Project is being undertaken.
Lafayette Yard was then required to issue bonds to pay $675,000 to the City for the City's cost of acquiring the property and the vacated portion of Peace Street.
On January 6, 2000, the City adopted two additional resolutions. Resolution No. 00-15 approved defendant's proposed plan for financing the project and made "certain other findings and determinations." The Resolution stated in part:
Section 1. It is hereby found and determined that [defendant] is engaged in activities that are public in nature and constitute purposes that are permitted under the General Non-Profit Corporation Law of the State of New Jersey and that the Project that is being financed by [defendant] is located within the geographic boundaries of the City.
....
Section 6. The City agrees to accept full legal title to the Project financed by [defendant] upon payment of the Bonds, the Subordinated Loans and the Unsecured Loans, and any related amounts required in connection with the payment or defeasance thereof.
Section 7. The City hereby approves [defendant] and its membership as well as the Bonds, the Secured Subordinated Loans and Unsecured Loans being issued by [defendant] to finance the Project as referenced in the preambles hereof.
Section 8. The specific purposes and activities of [defendant] in undertaking the Project are hereby approved.
Resolution No. 00-32 authorized the City to enter into a Municipal Services Fee Agreement (Fee Agreement) with Lafayette Yard for development of the Marriott Hotel. The Fee Agreement required defendant to "issue bonds to finance the construction of the Project pursuant to a bond resolution." The Fee Agreement further provided that Lafayette Yard would pay the City an annual municipal services fee in the amount of "2% of the `total project costs' as defined in N.J.S.A. 40A:20-3(h) *663 ..., commencing as of the date paying guests are first admitted to the [Marriott]."
On March 14, 2000, the City adopted Resolution No. 00-139, authorizing a Bond and Subsidy Agreement (Subsidy Agreement) with Lafayette Yard for financing the project, and guarantying unconditionally payment of defendant's debt by the City. The resolution provided in part:
WHEREAS, [defendant] has been formed by public spirited citizens under the New Jersey Corporation Act (N.J.S.A. 15A:1-1 et seq.) to provide for the redevelopment of the 3.1 acres site known as the Lafayette Yard property located in the City of Trenton (the "City"), consisting of a hotel, a conference center and a parking facility (the "Project") and has been designated by the City as the redeveloper of such site pursuant to ... (the "Redevelopment Law"); and
....
WHEREAS, in order to raise funds with which to provide the financing for the Project, [defendant] intends to issue bonds in the aggregate principal [sic] amount of $31,000,000 ...; and
....
WHEREAS, [defendant] was formed consistent with the provisions of the Internal Revenue Service Ruling 63-20 (the "Revenue Ruling") and Revenue Procedure 82-26 (the "Revenue Procedure") in order to enable [defendant] to issue the Bonds, the interest on which is not includable in gross income for federal income tax purposes; and
WHEREAS, the City has determined that the success of the Project would be significantly enhanced if the City were to provide a commitment of its credit annually to support the annual debt service on the Bonds issued by [defendant] to finance a portion of the cost of the Project in the event that, for any reason, the revenues generated from the Project are insufficient in a given year to provide sufficient funds to pay the principal and/or interest on such Bonds; and
WHEREAS, in order to provide an inducement to the prospective purchasers of the Bonds to purchase the same and to provide additional security to the holders thereof, the City, in accordance with the provisions [of] the Redevelopment Law, desires to provide an agreement to extend credit or other periodic subsidies to [defendant] to assure that the Debt Service Reserve Fund established under the General Bond Resolution is always maintained at the Debt Service Reserve Requirement established thereunder....
....
NOW, THEREFORE, BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF TRENTON AS FOLLOWS:
Section 1. Pursuant to the provisions of the Redevelopment Law, the City hereby agrees to guarantee unconditionally the punctual payment of the principal of and the interest on the Bonds by providing for payments to [defendant] on a semiannual basis, consistent with and pursuant to the requirements of the General Bond Resolution regarding the manner and time of payment of the principal and interest on the Bonds to assure that the Debt Service Reserve Fund is maintained for such Bonds at a level equal to the Debt Service Reserve Fund... as defined therein.
In accordance with Resolution No. 00-139, the City and Lafayette Yard entered into the Subsidy Agreement on April 1, 2000. The City's obligations under the agreement were "absolute and unconditional" and were to "remain in full force *664 and effect" until the outstanding bonds had been paid.
Lafayette Yard issued almost $34 million in tax-exempt bonds authorized under Revenue Ruling 63-20 and Revenue Procedure 82-26. The bonds were issued in defendant's name, and the debt service on them is paid with funds from defendant's operating budget. The City guaranteed the bonds unconditionally.
It is against this factual framework that the trial judge concluded that Lafayette Yard is not a public body for the purposes of the OPMA and that neither the Board meetings nor the minutes thereof were open to the public.

II
The Open Public Meetings Act, N.J.S.A. 10:4-6 to -21, "requires that the public and the press have advance notice of and the opportunity to attend most meetings, including executive sessions, of public bodies, except where the public interest or individual rights would be jeopardized." Introductory Statement, N.J.S.A. 10:4-6. "The Legislature finds and declares that the right of the public to be present at all meetings of public bodies, and to witness in full detail all phases of deliberation, policy formulation, and decision making of public bodies, is vital to the enhancement and proper functioning of the democratic process...." N.J.S.A. 10:4-7. "[I]nformal or purely advisory bodies with no effective authority are not covered, [by the OPMA] nor are groupings composed of a public official with subordinates or advisors, who are not empowered to act by vote...." Ibid.
A "public body" is defined in the OPMA as:
[A] commission, authority, board, council, committee or any other group of two or more persons organized under the laws of this State, and collectively empowered as a voting body to perform a public governmental function affecting the rights, duties, obligations, privileges, benefits, or other legal relations of any person, or collectively authorized to spend public funds including the Legislature, but does not mean or include the judicial branch of the government, any grand or petit jury, any parole board or any agency or body acting in a parole capacity, the State Commission of Investigation, the Apportionment Commission established under Article IV, Section III, of the Constitution, or any political party committee organized under Title 19 of the Revised Statutes.
[N.J.S.A. 10:4-8a.]
To be subject to the OPMA, therefore, a "public body" must (1) consist of "two or more persons" and (2) be "collectively empowered as a voting body" (3) "to perform a public governmental function affecting the rights, duties, obligations, privileges, benefits or other legal relations of any person or collectively authorized to spend public funds." N.J.S.A. 10:4-8a (emphasis added).
In considering the Times' application, the trial judge found "no question that the first two prongs of N.J.S.A. 10:4-8a had been met." We agree. We have previously held that non-profit corporations formed for the purpose of advancing a governmental goal or expending public monies are subject to the OPMA. See, e.g., State Coll. Locals v. State Coll. Gov. Bds., 226 N.J.Super. 556, 558, 545 A.2d 204 (App.Div.1988) (holding that a non-profit corporation formed for the purpose of advocating improvement in State colleges and expending public monies for operating expenses was subject to the OPMA). The trial judge concluded, however, that Lafayette Yard did not meet the third prong of the definition because the Times failed to *665 demonstrate that the Board either: (1) performed a public governmental function affecting the rights, duties, obligations, privileges, benefits or other legal relations of any person, or (2) was collectively authorized to spend public funds. It is here that we disagree.
The trial court appears to have relied on FFC, Ltd. v. N.J. State Dept. of Labor, Wage & Hour Compliance Div., 316 N.J.Super. 437, 720 A.2d 619 (App.Div. 1998), in concluding that the Board did not perform a governmental function affecting the rights and benefits of Trenton's citizens. In FFC, the question before us was whether the Prevailing Wage Act, N.J.S.A. 34:11-56.25, applied to a contract between Circle F, a non-profit "urban renewal entity," and a private for-profit general contractor. Id. at 440-41, 720 A.2d 619. We determined that Circle F was not a public body for purposes of the Prevailing Wage Act. Id. at 447, 720 A.2d 619.
FFC, however, differs significantly from the case before us, beginning with the definition of "public body" in the Prevailing Wage Act:
"Public body" means the State of New Jersey, any of its political subdivisions, any authority created by the Legislature of the State of New Jersey and any instrumentality or agency of the State of New Jersey or any of its political subdivisions.
[N.J.S.A. 34:11-56.26(4).]
Circle F was a limited partnership comprised of Lutheran Senior Services, Inc., as the general partner and several private limited partners. FFC, supra, 316 N.J.Super. at 441, 720 A.2d 619. The City of Trenton had received a grant from the Department of Community Affairs (DCA) "to finance the conversion of the Circle F factory building in Trenton into seventy affordable housing units for senior citizens." Id. at 441, 720 A.2d 619. The City entered into a Developer's Agreement with Circle F, which in turn, entered a contract with a private, for-profit general contractor. Id. at 441-42, 720 A.2d 619. Although Circle F was an "urban renewal entity" pursuant to the Long Term Tax Exemption Law, N.J.S.A. 40A:20-1 to -20, it was a partnership of private entities, none of whose members were appointed by public officials. Id. at 441-42, 720 A.2d 619. Circle F was not developing property donated to it by the City, nor did it issue municipally guaranteed tax-free bonds to finance the project. Ibid. On the other hand, Circle F was authorized to spend public funds by virtue of the DCA grant. Id. at 440-41, 720 A.2d 619. Indeed, Circle F would have met the third prong of the OPMA definition of a "public body" although it did not qualify as a "public body" under the Prevailing Wage Act. Consequently, FFC does not support the trial court's conclusion that Lafayette Yard is not a "public body" under the OPMA definition.
The Times argues that Lafayette Yard is a "public body" under N.J.S.A. 10:4-8(a), because it: (A) is performing a public governmental function as the City's designated redeveloper under the Redevelopment Act, N.J.S.A. 40A:12A-1; and (B) is collectively authorized to spend public funds. We agree that Lafayette Yard qualifies as a "public body" under both the public governmental function and expenditure of public funds tests.
A. Public Governmental Function
We initially consider Lafayette Yard's governing documents, the City's resolutions and the agreements between the City and Lafayette Yard. The Certificate of Incorporation states that Lafayette Yard's corporate purpose is to redevelop municipal property. Its bylaws provide that the Board members shall be appointed and *666 may be removed by the Mayor and City Council. The Disposition Agreement provides for the City to transfer public property to Lafayette Yard for $1.00 and for Lafayette Yard to issue tax-exempt, municipally guaranteed bonds to finance the project and reimburse the City for its costs to acquire the property. The Disposition Agreement expressly states that "the redevelopment of the Property ... [is] in the best interests of the City of Trenton and the health, safety, and welfare of its residents" and that the project was undertaken in accordance with these "public purposes." Resolution No. 00-15 states that Lafayette Yard "is engaged in activities that are public in nature," and that the project will revert to the City upon payment of the debt. Thus, by virtue of the declarations of the City and Lafayette Yard, Lafayette Yard was created for "public purposes" to engage in activities of a "public nature" to implement public redevelopment goals on publicly donated property which will revert to the public entity.
We next look to the Redevelopment Law which authorized the creation and funding of Lafayette Yard. In adopting the Redevelopment Law, the Legislature declared that the purpose of the law was to reverse deteriorating housing, commercial, industrial and civic facilities and "to promote the advancement of community interests through ... redevelopment, rehabilitation and incentives to ... expan[d] and improve[]" those facilities. N.J.S.A. 40A:12A-2b. The law's stated goal is to "promot[e] the physical development that will be most conducive to the social and economic improvement of the State and its several municipalities." N.J.S.A. 40A:12A-2c.
Under the Redevelopment Law, a municipality has several options by which it may undertake a redevelopment project:
(1) it may redevelop the area itself; (2) it may redevelop the area through a public entity such as a housing authority; (3) it may create a municipal redevelopment agency; or (4) it may designate a private redevelopment entity. N.J.S.A. 40A:12A-3, 12A-4c, 12A-11. By legislative act and stated intent, therefore, redevelopment, pursuant to the statute, is a governmental function for the benefit of the public, regardless of whether it is undertaken directly by the municipality or a designated redevelopment entity.
We reject Lafayette Yard's argument that it should not be subject to OPMA because it is "a private commercial enterprise engaged in a self-supporting proprietary function." In support of its position, Lafayette Yard relies on Cloyes v. Del. Tp., 41 N.J.Super. 27, 124 A.2d 37 (App. Div.1956), aff'd, 23 N.J. 324, 129 A.2d 1 (1957), in which we distinguished between proprietary and governmental functions for the purpose of determining municipal tort liability prior to the Tort Claims Act. We characterized as proprietary a "function [that] could be performed as well by a private corporation," or a function that "derives a profit," or a "function [that] concerns the sale of a commodity or service." Id. at 33, 124 A.2d 37. Governmental functions, on the other hand, "are available to all taxpayers," whether or not they are used by all, and derive from a "duty to all." Id. at 34, 124 A.2d 37. Where "only those who actually use the service pay for it; [and] it is not general[ly] ... available to the municipal public at large" it is proprietary rather than governmental. Id. at 34, 124 A.2d 37. We expressed doubt, however, that the distinction between proprietary and governmental functions was appropriate "under the social and economic conditions that obtain today." Id. at 36, 124 A.2d 37. We stated that "[t]he modern trend is to broaden the base of tort liability of municipal government for negligence *667 instead of narrowly cribbing and confining it within the bounds of artificial distinctions." Ibid. The Tort Claims Act, of course, eliminated the distinction that defendant now urges us to apply to the OPMA. As we noted in 1956, distinguishing between proprietary and governmental functions for the purpose of narrowing responsibility in the conduct of the public's business is artificial and outmoded. Ibid.
Moreover, we consider the Lafayette Yard project in the vein of the "public trust" doctrine. See, e.g., Secure Heritage, Inc. v. City of Cape May, 361 N.J.Super. 281, 825 A.2d 534 (App.Div.), certif. denied, 178 N.J. 32, 834 A.2d 405 (2003); Bubis v. Kassin, 353 N.J.Super. 415, 803 A.2d 146 (App.Div.2002). The donation of 3.1 acres to Lafayette Yard by the City for the duration of the redevelopment project and the reversion of the land and project to the City after repayment of the debt effectively establishes a "public trust" with Lafayette Yard as the trustee. See, e.g., Van Ness v. Boro. Of Deal, 78 N.J. 174, 179, 393 A.2d 571 (1978); Slocum v. Belmar Boro., 238 N.J.Super. 179, 185, 569 A.2d 312 (Law Div.1989). While the public trust doctrine is ordinarily applied to tidal lands, it "should not be considered fixed or static." Slocum, supra, 238 N.J.Super. at 186, 569 A.2d 312. Rather, it "should be molded and extended to meet the changing conditions and needs of the public it was created to benefit." Ibid. The doctrine is premised on the rights of all citizens to use and benefit from public property. The duties of the public trustee are the same as those of a private trustee. Ibid. "A trustee is defined as the person appointed, or required by law, to execute a trust; one in whom an estate, interest, or power is vested, under an express or implied agreement to administer or exercise it for the benefit of another." Ibid. Lafayette Yard is charged with developing and operating through Marriott, its contractor, a revenue-generating asset for the benefit of the City. The project is built on land donated by the City, funded by tax-exempt bonds unconditionally guaranteed by the City; it is intended to provide jobs and tax revenues for the City, and will revert to the City upon payment of the debt. As such, Lafayette Yard is a public trustee owning and operating a public trust for the benefit of the public and is, thereby, performing a public governmental function.
We hold that the founding documents forming Lafayette Yard, the resolutions and agreements authorizing its redevelopment of the property donated to it by the City, together with the Redevelopment Law and the public trust doctrine, clearly establish that Lafayette Yard is a "public body" collectively empowered "to perform a governmental function affecting the rights, duties, obligations, privileges, benefits or other legal relations of any other person." N.J.S.A. 10:4-8a.
B. Public Funds
Under the New Jersey Constitution, Article VIII, Section III, paragraph 3, a governmental entity is prohibited from giving property, lending money, or extending credit to a private entity for private use. This constitutional provision expressed the fundamental principle "that public money should be raised and used only for public purposes." Roe v. Kervick, 42 N.J. 191, 207, 199 A.2d 834 (1964). Public monies may, of course, be given and public credit extended to a private entity for a public purpose. Ibid.
But when is public money or credit being given or loaned for a private, as distinguished from a public, purpose? The concept of public purpose is a broad one. Generally speaking, it connotes an activity which serves as a benefit to the community as a whole, and ... at the *668 same time is directly related to the functions of government. Moreover, [the definition of public purpose] cannot be static in its implications. To be serviceable it must expand when necessary to encompass changing public needs of a modern dynamic society. Thus it is incapable of exact or perduring definition. In each instance where the test is to be applied the decision must be reached with reference to the object sought to be accomplished and ... manner in which the object affects the public welfare.

[Ibid. (citations omitted) (emphasis added).]
In Roe, the Court held that a now-repealed redevelopment assistance statute, similar to the current Redevelopment Law, did not violate the New Jersey Constitution because it authorized the transfer of public monies to private entities for a public purpose, i.e., redevelopment of derelict properties. Id. at 229-231, 199 A.2d 834. The Court noted that:
[B]y virtue of the contract, the private operator is so closely identified with accomplishment of the public purpose, and his business activity is so strictly pointed in that direction, that for practical purposes he represents the controlled means by which the government accomplishes a proper objective.
....
When the character of the contract is studied in light of the scope and restrictions of the federal and State Laws, the fact becomes evident that although the agency establishing the project is a private one, it is so circumscribed in its operation as to be considered in a sense a controlled instrumentality with respect to its use of the limited public financial assistance. Obviously the funds of a State or a county or municipality could not be loaned to a private agency to be used as an agency pleased. Clearly the Constitution would stand in the way. But when the loan is granted for an obvious public purpose and its use confined to the execution of that purpose through a reasonable measure of control by a public authority by means of contractual stipulation, statutory and administrative regulation, the private agency takes on the form of a special public agent for the paramount purpose of devoting the money to relief of unemployment.

[Id. at 219-222, 199 A.2d 834 (emphasis added).]
After Roe, we addressed a challenge to Atlantic City's donation of 150 acres to a private redeveloper for the "development of a `world class entertainment/recreation' facility," and affirmed the trial judge's finding that the public land was donated for a public purpose in "that the City was attempting to convert `otherwise fallow land into productive, tax-generating property' which would employ a number of citizens and improve the City's economy." Bryant v. City of Atlantic City, 309 N.J.Super. 596, 605, 612, 707 A.2d 1072 (App.Div.1998). Relying on Roe, we held that where the funded activity serves a benefit to the community as a whole and is directly related to the functions of government, the donation of public land to a private redeveloper passes constitutional muster. Id. at 613-14, 707 A.2d 1072.
Moreover, the Redevelopment Law empowers a municipality "to lend or donate money or make capital grants or periodic subsidies" to a redevelopment entity. N.J.S.A. 40A:12A-41. This statutory authorization is consistent with the constitutional prohibition against using public monies for private purposes because grants under the Redevelopment Law are expressly intended for a public purpose.
*669 The City was authorized by the New Jersey Constitution and the Redevelopment Law to donate land and extend public credit to guaranty the tax-free bonds issued by Lafayette Yard to finance the redevelopment project. Lafayette Yard thereby derived its financial base from public funds and expended those funds for the redevelopment project.
Lafayette Yard strenuously argues that the public policies underlying the OPMA and the Redevelopment Law are antithetical to the imposition of the OPMA on a private entity engaged in implementing a public purpose. Defendant contends that "there is no public policy or manifest legislative intent that mandates that this court... confer a `quasi-governmental' status upon the private redeveloper to reconcile its activities with the constitutional prohibition against the taking of property for private uses." This argument distorts the issue before us. We are focused solely on whether the redevelopment entity in this case is a "public body" for the purposes of the OPMA. In other words, the question is whether the public is entitled to access the Board meetings of a private redevelopment entity created solely for the public purpose of redeveloping public land donated to it by a public entity and financed with publicly guaranteed tax-free bonds. The answer is a resounding yes.
As we noted previously, the legislative intent for the OPMA was clearly articulated in the Legislative Findings and Declarations, N.J.S.A. 10:4-7, and the Introductory Statement to the Act, N.J.S.A. 10:4-6. The democratic process is enhanced when citizens have "the right to attend all meetings of public bodies at which any business affecting the public is discussed or acted upon in any way." N.J.S.A. 10:4-7 (emphasis added).
Defendant maintains that the statutory and contract restrictions on the private redeveloper adequately protect the public interest and that a private entity's agreement to partner with a governmental entity for redevelopment purposes does not convert the private entity into a public body. We cannot agree with that proposition where the private entity was expressly formed for a public purpose. This is not a situation in which a private general contractor contracted with the City to construct the hotel-conference center-parking facility on public land. If that were the case, clearly the private general contractor would not be subject to OPMA, but the City would be. Unlike a private general contractor, Lafayette Yard was formed expressly for the public purpose of redeveloping public land, and as such, it is subject to public scrutiny.
We hold that a private redevelopment entity is "collectively authorized to spend public funds" and, therefore, subject to the OPMA, when it redevelops public land donated to it by a municipality and finances the redevelopment through municipally guaranteed tax-free bonds.

III
The Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13, was expressly intended by the Legislature to make records of a "public agency" "readily accessible for inspection, copying, or examination by the citizens of this State." N.J.S.A. 47:1A-1. A newspaper has the same right of access to public records as a private citizen. Williams v. Bd. of Educ. of Atlantic City, 329 N.J.Super. 308, 747 A.2d 809 (App.Div.), certif. denied, 165 N.J. 488, 758 A.2d 648 (2000).
A "public agency" is defined in the OPRA as "any division, board, bureau, office, commission or other instrumentality within or created by a political subdivision of the State ... and any independent authority, commission, instrumentality or agency created by a political subdivision." N.J.S.A. 47:1A-1.1 (emphasis added). We *670 are persuaded that Lafayette Yard is an "instrumentality" created by the City and a "public agency" under the OPRA for essentially the same reasons that it is a "public body" under the OPMA. The minutes of the Board meetings shall be made available for inspection, copying and examination in accordance with the OPRA.

CONCLUSION
We reverse the order of the trial court entered on February 19, 2003, dismissing the complaint, and remand for further proceedings in accordance with this opinion.
R.B. COLEMAN, J.A.D., concurring.[2]
In our opinion, we stated that "we consider the Lafayette Yard project in the vein of the `public trust' doctrine," which is not static, but which it has been said "should be molded and extended to meet the changing conditions and needs of the public it was created to benefit." Slocum v. Belmar Boro., 238 N.J. Super. 179, 186, 569 A.2d 312 (Law Div.1989). That reference, as I understand it, is intended to emphasize the vitality and flexibility of trust concepts applicable to public property. In my view, the statement should not be read to signal an expansion of the types of properties historically included in the public trust doctrine. The statement should be understood only as an analogous reference. On that basis, I concur.
NOTES
[1] At oral argument, counsel advised us that the hotel is now fully operational.
[2] Editor's Note: The concurring opinion was added on May 20, 2004 as the result of a motion for reconsideration.