874 A.2d 1064

THE TIMES OF TRENTON PUBLISHING CORPORATION, PLAINTIFF–RESPONDENT, v. LAFAYETTE YARD COMMUNITY DEVELOPMENT CORPORATION, DEFENDANT–APPELLANT.

Argued January 3, 2005—Decided June 15, 2005.

*Rocky L. Peterson* argued the cause for appellant (*Hill Wallack*, attorneys; *Mr. Peterson* and *Dakar R. Ross*, on the briefs).

*Keith J. Miller* argued the cause for respondent (*Robinson & Livelli*, attorneys).

Chief Justice PORITZ delivered the opinion of the Court.

The essential facts of this case are not in dispute. A reporter for The Times of Trenton Publishing Corporation (The Times) was not permitted to attend various board meetings of Lafayette Yard

Community Development Corporation (Lafayette Yard or Corporation) and, further, was denied access to the minutes of those meetings. The Times filed a complaint against the Corporation claiming that the provisions of the Open Public Meetings Act, *N.J.S.A.* 10:4–6 to –21, and the Open Public Records Act, *N.J.S.A.* 47:1A–1 to –13, govern access to the meetings of the Corporation's Board of Trustees (Board or Trustees) and to the minutes of those meetings. We hold today that Lafayette Yard is subject to both statutes because it is a "public body" that "perform[s] a governmental function" within the meaning of *N.J.S.A.* 10:4–8a, and because it is an "instrumentality or agency created by a political subdivision" under *N.J.S.A.* 47:1A–1.1.

## I.

### A.

As described in its Certificate of Incorporation filed on June 8, 1998, respondent Lafayette Yard is a private, nonprofit corporation established solely "to assist the City of Trenton ..., the Trenton Parking Authority and the State of New Jersey to provide for the redevelopment of a 3.1 acre site known as the Lafayette Yard property located in the City ... [and to] consist[ ] of a hotel, conference center and parking facility." At that time, the City of Trenton had acquired or was acquiring the 3.1 acres, which included property located in the John Fitch Way I Redevelopment Area, described on the City Tax Maps as Block 1H, Lots 150, 153 and 154, and the rights and interests of the State of New Jersey to a vacated portion of Peace Street known as Memorial Drive. It was the City's intent, by agreement with the Corporation, to facilitate the redevelopment of a pivotal area adjacent to the War Memorial Building and close to the State's Capitol Complex in downtown Trenton.

Although Lafayette Yard is able to "exercise any and all of the powers enumerated in *N.J.S.A.* 15A:3–1" (pertaining to the powers of nonprofit corporations), it operates under certain constraints as

set forth in Internal Revenue Service (IRS) *Revenue Ruling* 63–20 and *Revenue Procedure* 82–26. By that means, the Corporation is able to issue tax-exempt bonds because its debt is deemed by the IRS to have been "issued 'on behalf' of the state or a political subdivision" of the state. Thus, the Corporation can "take no action" contrary to *Revenue Ruling* 63–20 and *Revenue Procedure* 82–26, which require, among other things, that title to the property held by the Corporation revert to the City when the Corporation's indebtedness is retired. Similarly,

[t]he governmental unit on whose behalf the nonprofit corporation is issuing the [tax-free] obligations [must] ... appoint[ ] or approve[ ] the appointment of at least 80 percent of the members of the governing board of the corporation, and ... [must have] the power to remove, for cause, ... any member of the governing board and appoint a successor.

Those requirements, and others, are set forth with specificity in Lafayette Yard's Certificate of Incorporation and in its Bylaws. By way of example, five of the Corporation's seven uncompensated Trustees were initially selected by the Mayor (with two named later by the City Council), whereas subsequent vacancies on the Board were required to be filled by the Mayor and approved by the City Council.[1] Any Trustee "may be removed for cause by (a) a majority vote of the entire Board, or (b) by a majority vote of the City Council of the City approved by the Mayor of the City." Indeed, any amendment to the Bylaws also must be approved by the Mayor. Further, once the debt issued by the Corporation is retired, or in the event that the Corporation is dissolved, the Corporation is required to convey its assets to the City. On completion of construction, however, the parking garage was to be

---

[1] The current Board members are Dennis Gonzalez, Director of City Housing Department; William Watson, Thomas Edison State College; Elgin Clemons, Director of Trenton Economic Development Corporation; Renee Haynes, City of Trenton Chief of Staff; Paul Anzano, Esq., Pringle Quinn Anzano, P.C.; Matthew Bergheiser, Executive Director, Trenton Downtown Association, Inc.; and Cordelia Staton, City Councilperson at Large. The initial Board members included Alan Mallach, City Resident; Shelley Zeiger, City Developer; Gwendolyn I. Long (Harris), former City Chief of Staff; David Ong of Acquest Realty Advisors, Inc.; Gregory Williams, Mercer County Representative; David Shore, Trenton Development; and John Cipriano, former Councilperson.

transferred to the Trenton Parking Authority, and the hotel and conference center, described in the record as the Trenton Marriott Hotel and Conference Center, were to be retained by the Corporation until retirement of its debt.[2]

## B.

On July 1, 1999, the City passed Resolution No. 99–527 approving the transfer of the redevelopment property for one dollar. The resolution provided that "the development of a downtown hotel and conference center [is] a key element in the City's economic development strategy," that Lafayette Yard "possesses the qualifications[,] and [that] the financing mechanisms are available[,] which are necessary to acquire and redevelop the property." Thereafter, in September 1999, the City and Lafayette Yard entered into a Disposition Agreement in accordance with Resolution No. 99–527. Among other things, the Disposition Agreement designated the City as the "Agency" and Lafayette Yard as the "Redeveloper," pursuant to the Local Redevelopment and Housing Law (Redevelopment Law), *N.J.S.A.* 40A:12A–1 to –73, and the City's duly-adopted redevelopment plan. Under the Disposition Agreement, "the Agency agree[d] to sell the [3.1 acres] to the Redeveloper for one dollar" and Lafayette Yard agreed to issue bonds so as to pay $675,000 to the City, the amount the City expended in acquiring the redevelopment property, and "to construct [the] hotel and conference center and structured parking." The Disposition Agreement also gave the Agency, through its Department of Inspection, the authority to "review and approve, or reject, the Project Plans."

A few months later, the City adopted Resolution No. 00–15, which approved Lafayette Yard's proposed financing plan,[3] includ-

---

[2] Those requirements are found in a fee agreement entered into by the City and Lafayette Yard on April 26, 2000. *See infra* at 524–25, 874 *A*.2d at 1067–68 n. 3.

[3] At the same time, the City adopted Resolution No. 00–32, which authorized a Municipal Services Fee Agreement (Fee Agreement) between the City and

ing the issuance of bonds in the aggregate principal amount of $31,000,000, as well as certain secured and unsecured loan transactions involving the New Jersey Economic Development Authority, the Capital City's Redevelopment Corporation, the State of New Jersey and the Parking Authority of the City of Trenton, and amounting in total to $14,525,000. The Resolution also specifically stated that Lafayette Yard "was formed consistent with the provisions of the Internal Revenue Service *Revenue Ruling* 63–20 . . . and *Revenue Procedure* 82–26 . . . in order to enable the Corporation to issue the Bonds, the Secured Subordinated Loans and the Unsecured Loans with interest that is exempt from federal income taxation." In recognition of the need to make "certain determinations and approvals," and, thereby to conform to the requirements of the *Revenue Ruling* and *Procedure,* the City found that Lafayette Yard was "engaged in activities that are public in nature;" that it was established as a nonprofit corporation; that any accrued income would not "benefit" a "private person;" that the City had a "beneficial interest" in Lafayette Yard so long as the bonds and loans "remain[ed] outstanding;" and that

> [t]he City agree[d] to accept full legal title to the Project financed by [Lafayette Yard] upon payment of the Bonds, the Subordinate Loans and the Unsecured Loans, and any related amounts required in connection with the payment or defeasance thereof.

The final piece in the legal structure designed to facilitate the redevelopment project was completed on April 1, 2000, when the City and Lafayette Yard entered into a Bond and Subsidy Agreement (Subsidy Agreement) that had been approved by Resolution No. 00–139 on March 14, 2000. By the Subsidy Agreement,

> the City . . . agree[d] to guarantee unconditionally the punctual payment of the principal of and the interest on the Bonds, regardless of whether the interest [was] taxable or tax-exempt for Federal and State income tax purposes, by providing for payments to the Corporation on a semiannual basis . . . to assure that the Debt

Lafayette Yard. Under the Fee Agreement, signed on April 26, 2000, Lafayette Yard was required to "pay to the City an annual municipal services fee in the amount of 2% of the 'total project costs' as defined in *N.J.S.A.* 40A:20–3(h) . . . , commencing as of the date paying guests are first admitted to the Hotel & Conference Center."

Service Reserve Fund [was] maintained for such Bonds at the level equal to the Debt Service Reserve Requirement as defined therein. The aggregate principal amount of Bonds [was] not [to] exceed $31,000,000. The full faith and credit of the City [were] pledged for the full and punctual performance of [the] Agreement.

And, "[t]he Corporation agree[d] to apply the proceeds derived from the sale of the Bonds for Costs associated with the Project. . . ." The rationale for the City's "commitment of its credit" was to enhance the success of the redevelopment project by attracting investors who, in the event that the project's revenues proved insufficient to cover the principal or interest on the bonds, would receive payment from the City. With that understanding, Lafayette Yard issued $33,770,000 in tax-exempt bonds, varying in principal amounts and maturity periods, to fund the hotel, conference center and parking facility.

## II.

We turn now to the factual context within which this litigation arises. In or about March 2002, Albert Raboteau, a reporter from The Times, sought and was denied access to a meeting of the Board of Lafayette Yard. The Mayor of Trenton, Douglas H. Palmer, informed Raboteau that Lafayette Yard was a private corporation and that the Open Public Meetings Act (OPMA), *N.J.S.A.* 10:4–6 to –21, did not apply to the activities of the Board. Ultimately, the parties negotiated an agreement through counsel whereby Raboteau would be allowed to attend the Board's monthly meetings; subsequently, however, Raboteau was denied full access to two consecutive Board meetings on June 27 and then, again, on August 29, 2002. At the first meeting, the Chair of the Board ordered Raboteau to leave while the Trustees discussed a "pending financial transaction." At the second meeting, Raboteau was excluded without explanation. Raboteau also was denied access to the minutes of both meetings.

As a result, on October 9, 2002, The Times filed a verified complaint in lieu of prerogative writs and an order to show cause. The Times sought to enjoin Lafayette Yard from excluding the public from its Board meetings in violation of OPMA, and to

require the Trustees to produce for public inspection the minutes of all past and future Board meetings. The trial court signed the order to show cause on October 15, 2002, but deferred on the request for an injunction until the completion of discovery. The court thereafter denied injunctive relief and, on February 3, 2003, issued an opinion holding that Lafayette Yard was neither a "public body" as defined by OPMA, nor a "public agency" subject to the Open Public Records Act (OPRA), *N.J.S.A.* 47:1A–1 to –13. Accordingly, on February 19, 2003, the trial court dismissed the verified complaint.

On appeal, the Appellate Division reversed the trial court and remanded the matter for further proceedings. *Times of Trenton Publ'g Corp. v. Lafayette Yard Comty. Dev. Corp.,* 368 *N.J.Super.* 425, 442, 846 *A.*2d 659 (2004). The Appellate Division considered Lafayette Yard's Certificate of Incorporation and its Bylaws, together with the City's Resolutions and the Agreements between the City and the Corporation, and held that "Lafayette Yard is a 'public body' collectively empowered 'to perform a governmental function affecting the rights, duties, obligations, privileges, benefits or other legal relations of any other person' " under *N.J.S.A.* 10:4–8a, the core relevant OPMA provision. *Id.* at 438, 846 *A.*2d 659. The panel also considered the donation of the 3.1 acre site to the Corporation for the period of redevelopment and until the bonds were retired to effectuate a " 'public trust' with Lafayette Yard as the Trustee" holding "for the benefit of the public and . . . performing a public governmental function." *Id.* at 437–38, 846 *A.*2d 659. Alternatively, the Appellate Division held that "when [a private entity] redevelops public land donated to it by a municipality and finances the redevelopment through municipally guaranteed tax-free bonds," it spends public funds and is "subject to the OPMA." *Id.* at 441, 846 *A.*2d 659.

For the same reasons, the panel determined "that Lafayette Yard is an 'instrumentality' created by the City and a 'public agency' " within the meaning of OPRA, and ordered that "[t]he minutes of the Board meetings . . . be made available [to the

public] for inspection, copying and examination." *Id.* at 442, 846 *A.*2d 659. We granted certification, 181 *N.J.* 286, 854 *A.*2d 920 (2004), to consider whether Lafayette Yard is a "public body" subject to OPMA or a "public agency" subject to OPRA.

### III.

#### A.

The New Jersey Constitution, Article VIII, Section 3, Paragraph 1, provides:

> The clearance, replanning, development or redevelopment of blighted areas shall be a public purpose and public use, for which private property may be taken or acquired. Municipal, public or private corporations may be authorized by law to undertake such clearance, replanning, development or redevelopment; and improvements made for these purposes and uses, or for any of them, may be exempted from taxation, in whole or in part, for a limited period of time during which the profits of and dividends payable by any private corporation enjoying such tax exemption shall be limited by law. The conditions of use, ownership, management and control of such improvements shall be regulated by law.

The goal of restoration of blighted areas is, then, a constitutional value in New Jersey.

The Redevelopment Law provides mechanisms by which "conditions of deterioration in housing, commercial and industrial installations, public services and facilities and other physical components and supports of community life," may be addressed. *N.J.S.A.* 40A:12A–2a. To ameliorate those "conditions of deterioration," the Legislature "empowered" local governments "to promote the advancement of community interests through programs of redevelopment, rehabilitation and incentives to the expansion and improvement of commercial, industrial, residential and civic facilities." *N.J.S.A.* 40A:12A–2b. Through those means, the legislative scheme is designed to "promot[e] the physical development that will be most conducive to the social and economic improvement of the State and its several municipalities." *N.J.S.A.* 40A:12A–2c.

Under the Redevelopment Law, municipalities are responsible for redevelopment planning and implementation. *N.J.S.A.*

40A:12A–4c. After a redevelopment plan[4] is adopted, a municipality may undertake a redevelopment project pursuant to the plan by exercising its responsibilities directly or through a municipal redevelopment agency or municipal housing authority. *Ibid.* The redevelopment entity, whether the municipality directly or an agency or authority, may issue bonds, acquire property, clear land, arrange for professional services, and

> [a]rrange or contract with public agencies or redevelopers for the planning, replanning, construction, or undertaking of any project or redevelopment work, or any part thereof; [and] negotiate and collect revenue from a redeveloper to defray the costs of the redevelopment entity.
>
> [*N.J.S.A.* 40A:12A–8a to –8f.]

Here, the City has contracted directly with Lafayette Yard, the redeveloper, but has chosen not to issue debt to finance the project directly. Rather, the City and the Corporation, by agreement, have structured their relationship to take advantage of IRS *Revenue Ruling* 63–20 and *Revenue Procedure* 82–26.

## B.

▓ "New Jersey has a strong, expressed public policy in favor of open government, as evidenced by our Open Public Meetings Act, *N.J.S.A.* 10:4–6 to –21...." *McClain v. Coll. Hosp.*, 99 *N.J.* 346, 355, 492 *A.*2d 991 (1985). That policy was described by the Legislature when it declared

> that the right of the public to be present at all meetings of public bodies, and to witness in full detail all phases of the deliberation, policy formulation, and decision making of public bodies, is vital to the enhancement and proper functioning of the democratic process; that secrecy in public affairs undermines the faith of the public in government and the public's effectiveness in fulfilling its role in a democratic society[;] and [that] it [is] the public policy of this State to insure the right of its citizens to have adequate advance notice of and the right to attend all meetings of public bodies at which any business affecting the public is discussed or acted upon in any way except only in those circumstances where otherwise the public interest would be clearly endangered or the personal privacy or guaranteed rights of individuals would be clearly in danger of unwarranted invasion.

---

4 "Redevelopment Plan," is defined, in part, as "a plan adopted ... for the redevelopment or rehabilitation of all or any part of a redevelopment area, or an area in need of rehabilitation." *N.J.S.A.* 40A:12A–3.

[*N.J.S.A.* 10:4–7.]

OPMA is focused, however, on open government, and its provisions therefore apply only to a "public body," defined by *N.J.S.A.* 10:4–8a as

> a commission, authority, board, council, committee or any other group of two or more persons organized under the laws of this State, and collectively empowered as a voting body to perform a public governmental function affecting the rights, duties, obligations, privileges, benefits, or other legal relations of any person, or collectively authorized to spend public funds.

■ If an entity is a "public body" within the meaning of OPMA it is subject to OPMA, and must open its meetings to the public. The relevant test is framed in the alternative—the entity must perform a governmental function as defined *or* must be authorized to expend public funds. In respect of this case, we must determine whether Lafayette Yard's relationship with the City and the requirements under which it operates are such that it satisfies either alternative.

## IV.

### A.

Lafayette Yard argues that it is a private nonprofit corporation properly established under State law. *See N.J.S.A.* 15A:1–1 to – 10. As a duly incorporated private nonprofit corporation, Lafayette Yard has all of the powers given to it by *N.J.S.A.* 15A:3–1 to – 5, including the right to enter into contracts, purchase and sell property, sue and be sued, and other enumerated corporate powers. Lafayette Yard's agreements with the City do not, the Corporation asserts, alter its fundamental character as a private entity carrying out a public purpose, *see Roe v. Kervick,* 42 *N.J.* 191, 199 *A.*2d 834 (1964), but not a governmental function.

Yet, Lafayette Yard, in carrying out its role as the redeveloper used by the City under the Redevelopment Law, and by those agreements with the City as well as its Certificate of Incorporation and Bylaws, has enabled the City to exercise substantial control over the Corporation and its conduct vis-a-vis the redevel-

opment project. Simply put, Lafayette Yard was created consistent with the provisions of IRS *Revenue Ruling* 63–20 and IRS *Revenue Procedure* 82–26, with the goal of reducing the costs of the project through the issuance of tax-exempt bonds. Those provisions, however, impose various conditions that suggest the Corporation is not simply a private entity.

Thus, the City is required to, and does, hold "a beneficial interest in the corporation while [its] indebtedness remains outstanding[,] and [will] obtain full legal title to the property of the corporation with respect to which the indebtedness was incurred upon the retirement of such indebtedness." *Rev. Rul.* 63–20. The City controls both the membership of the Corporation's Board and any proposed changes to the Bylaws (by veto of the Mayor), and also retains the authority to "review and approve, or reject, the Project Plans." Most important, IRS *Revenue Procedure* 82–26 describes the circumstances under which a nonprofit corporation's obligations "will be considered obligations of a state or a political subdivision of a state under section 103(a)(1) of the Internal Revenue Code" in order to qualify for tax-exempt status. In other words, as we earlier pointed out, it is only when the Corporation's debt is considered to have been "issued 'on behalf of' the State or a political subdivision" of the State that the interest earned on the debt so issued is tax-exempt. Moreover, in this case, the envelope has been pushed even further. In the Subsidy Agreement signed by Lafayette Yard and the City, the City unconditionally guaranteed the punctual payment of $31 million in bonds to be issued by Lafayette Yard, pledging therein the "full faith and credit" of the City in support of the bonds. Lafayette Yard's bonds have been issued on behalf of the City and are backed by the City's guarantee.

■ This case is not about whether a private corporation can be used to carry out a public purpose. That question was settled in New Jersey many years ago in such cases as *Wilson v. City of Long Branch*, 27 *N.J.* 360, 376, 142 *A.2d* 837 (1958) and *Kervick, supra*, 42 *N.J.* at 207, 199 *A.2d* 834. *See also Davidson Bros., Inc.*

*v. D. Katz & Sons, Inc.*, 121 *N.J.* 196, 215–19, 579 *A.*2d 288 (1990); *Bryant v. City of Atlantic City*, 309 *N.J.Super.* 596, 611–12, 707 *A.*2d 1072 (App.Div.1998). This case is about whether a redeveloper such as Lafayette Yard, controlled in large measure by a municipality and supported by the municipality's taxing power, performs a "governmental function" under OPMA such that the "rights, duties, obligations, privileges, benefits, or other legal relations of any person" are affected. *See N.J.S.A.* 10:4–8a. We find that in this factual context, a corporation such as Lafayette Yard does perform such a function and, therefore, is a "public body" subject to OPMA.[5]

On this point, we add only the following. The Appellate Division determined that application of the "public trust" doctrine to the facts of this case would lead to the same conclusion. We express no opinion on that determination, observing first that "[t]he original purpose of the [public trust] doctrine was to preserve for the use of all the public natural water resources for navigation and commerce, . . . and for fishing, an important source of food," *Borough of Neptune City v. Borough of Avon–by–the–Sea*, 61 *N.J.* 296, 304, 294 *A.*2d 47 (1972), and second, that more recently the doctrine has been applied in New Jersey to ensure access by the public to areas of the beach. *See Van Ness v. Borough of Deal*, 78 *N.J.* 174, 178, 393 *A.*2d 571 (1978) (applying

---

[5] As the Appellate Division observed, the trial court relied on *Foundation for Fair Contracting, Ltd. v. New Jersey State Department of Labor–Wage & Hour Compliance Division*, 316 *N.J.Super.* 437, 720 *A.*2d 619 (App.Div.1998), in deciding "that [Lafayette Yard does] not perform a governmental function." *Times of Trenton Publ'g Corp., supra*, 368 *N.J.Super.* at 434, 846 *A.*2d 659. In that case, the court held that an agreement between an urban renewal entity and a private for-profit contractor was not subject to the Prevailing Wage Act, *N.J.S.A.* 34:11–56.25 to –56.57, because the agreement was not a " 'contract . . . for . . . public work to which any public body [was] a party.' " *Found. for Fair Contracting, Ltd., supra*, 316 *N.J.Super.* at 444 (quoting *N.J.S.A.* 34:11–56.25), 448, 720 *A.*2d 619. We agree with the Appellate Division that *Foundation for Fair Contracting* involved a different statutory scheme, different statutory language and a different factual context, all of which make its holding distinguishable from the case at bar. *See Times of Trenton Publ'g Corp., supra*, 368 *N.J.Super.* at 434–35, 846 *A.*2d 659.

public trust doctrine to determine whether "dry beach area immediately in front of [a] [c]asino [was] subject to the doctrine and should [have been] available to the general public [for] proper enjoyment of public trust rights"); *Secure Heritage, Inc. v. City of Cape May*, 361 *N.J.Super.* 281, 302, 825 *A*.2d 534 (App.Div.), *certif. denied*, 178 *N.J.* 32, 834 *A*.2d 405 (2003) (applying public trust doctrine where city's beach revenue ordinance banned "sale and transferability of seasonal beach tags to the lodging industry").

### B.

■ Under OPMA, an entity also may be deemed a "public body," pursuant to *N.J.S.A.* 10:4-8a, if it is "collectively authorized to spend public funds." The Appellate Division held that Lafayette Yard is so authorized, citing two cases for the proposition that "where the funded activity serves a benefit to the community as a whole and is directly related to the functions of government, the donation of public land to a private redeveloper passes constitutional muster." *Times of Trenton Publ'g Corp.*, *supra*, 368 *N.J.Super.* at 440, 846 *A*.2d 659 (citing *Kervick*, *supra*, 42 *N.J.* at 207, 199 *A*.2d 834; *Bryant*, *supra*, 309 *N.J.Super.* at 613–14, 707 *A*.2d 1072). The issue, however, is not whether the donation of public land is constitutionally permissible (it is, for a public purpose); the issue is whether Lafayette Yard is authorized to spend public funds.

We have concluded that Lafayette Yard performs a governmental function such that the "public body" test is satisfied and that we need not reach the public funds question. We note nonetheless that when the City pledged its full faith and credit to guarantee $31 million of tax-exempt bonds issued by Lafayette Yard to finance the project, the City put its funds at risk in the event that Lafayette Yard were to default on its obligation. Lafayette Yard argues that the City's pledge does not authorize the expenditure of public funds because the bonds are not the City's debt. The Corporation reasons that revenues from the

project are the actual source of payment on the bonds, and that anticipation of a default is not a sufficient basis for concluding that public funds are implicated. Lafayette Yard invites the Court to apply principles enunciated in *Lonegan v. State*, 174 *N.J.* 435, 809 *A.*2d 91 (2002), wherein we stated:

> [T]he Court has almost universally sustained statutes authorizing the issuance of debt that is not backed by the full faith and credit of the State, generally when the debt is undertaken by an independent authority, most often when that authority has a revenue source available to service the principal and interest on the debt.
>
> [*Id.* at 439, 809 *A.*2d 91.]

Although a "revenue source" is "available" in this case, the City has guaranteed the Corporation's bonds. In short, the bonds are, ultimately, "backed by the full faith and credit of the [City]." *See ibid.* We reject Lafayette Yard's contingent liability argument in this context. To the extent that public funds, through the commitment of the City, have been put at risk, the OPMA alternative test has been met. *Cf. N.J. Tpk. Auth. v. Parsons*, 3 *N.J.* 235, 242, 69 *A.*2d 875 (1949) (holding that Turnpike Authority Act did not create debt or liability of the State because of explicit and unambiguous statement that issued bonds "shall not be deemed to constitute a debt or liability of the State . . . or a pledge of the faith and credit of the State").

## V.

■ The Times has asserted that Lafayette Yard is an "instrumentality or agency . . . created by a political subdivision" under *N.J.S.A.* 47:1A–1.1, and that the Corporation is therefore subject to the Open Public Records Act (OPRA), *N.J.S.A.* 47:1A–1 to –13. The Appellate Division agreed "for essentially the same reasons that [Lafayette Yard] is a 'public body' under the OPMA" and ordered "[t]he minutes of the Board meetings [to] be made available for inspection, copying and examination in accordance with . . . OPRA." *Times of Trenton Publ'g Corp., supra*, 368 *N.J.Super.* at 442, 846 *A.*2d 659. We also agree.

■ When OPRA was passed, the Legislature declared that "government records shall be readily accessible for inspection, copying, or examination by the citizens of this State, with certain exceptions, for the protection of the public interest, and any limitations on the right of access . . . shall be construed in favor of the public's right of access." *N.J.S.A.* 47:1A–1. The purpose of OPRA "is to maximize public knowledge about public affairs in order to ensure an informed citizenry and to minimize the evils inherent in a secluded process." *Asbury Park Press v. Ocean County Prosecutor's Office,* 374 *N.J.Super.* 312, 329, 864 *A.2d* 446 (Law Div.2004). To effectuate that purpose, OPRA defines "government records" broadly as

> any paper, written or printed book, document, drawing, map, plan, photograph, microfilm, data processed or image processed document, information stored or maintained electronically or by sound-recording or in a similar device, or any copy thereof, that has been made, maintained or kept on file in the course of his or its official business by any officer, commission, agency or authority of the State or of any political subdivision thereof, including subordinate boards thereof, or that has been received in the course of his or its official business by any such officer, commission, agency, or authority of the State or of any political subdivision thereof, including subordinate boards thereof.
> [*N.J.S.A.* 47:1A–1.1.]

An entity is subject to OPRA if it is a "public agency," defined, in relevant part, as "any political subdivision of the State or combination of political subdivisions, and any division, board, bureau, office, commission or other instrumentality within or created by a political subdivision of the State." *N.J.S.A.* 47:1A–1.1.

Lafayette Yard claims that it was not "created" by "a political subdivision of the State," but rather, by public-spirited citizens of the City who incorporated as a private nonprofit entity to assist the City in redeveloping the 3.1 acres designated as a key component in its redevelopment plan. That claim is true—as far as it goes. To accept it without further discussion would be to elevate form over substance to reach a result that subverts the broad reading of OPRA as intended by the Legislature. Suffice it to say that the Mayor and City Council have absolute control over the membership of the Board of Lafayette Yard and that the Corporation could only have been "created" with their approval. That the

conditions under which Lafayette Yard operates are dictated by IRS *Revenue Ruling* 63–20 and *Revenue Procedure* 82–26 is beside the point; the effect is that Lafayette Yard is subject to the requirements of OPRA.

## VI.

Lafayette Yard maintains that it was created to assist the City "unencumbered by the various bureaucratic burdens endemic to public entities." We express no view as to other "burdens" imposed on government or whether they apply to Lafayette Yard. Certainly, the language of any relevant statutes would have to be carefully examined, as would the specific factual context related to any claim. We hold only that Lafayette Yard is bound by OPMA and OPRA.

The judgment of the Appellate Division is affirmed as modified. The matter is remanded to the Superior Court, Law Division, for further proceedings consistent with this opinion.

*For affirmance as Modified/Remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—7.

*Opposed*—None.